## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

**Meryl J. Nass, M.D.**

     Plaintiff,

v.

**Maine Board of Licensure in Medicine, Maroulla S. Gleaton, M.D., Holly Fanjoy, M.D., Noah Nesin, M.D., Renee Fay-LeBlanc, M.D., Brad E. Waddell, M.D., Gregory Jamison, RPh, Noel Genova, PA, Lynne M. Weinstein, and Susan Dench**

     Defendants.

**Civil Action No. _____**

### COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Meryl J. Nass, M.D. complains against the Maine Board of Licensure in Medicine ("BOLIM" or the "Board") and Maroulla S. Gleaton, M.D., Holly Fanjoy, M.D., Noah Nesin, M.D., Renee Fay-LeBlanc, M.D., Brad E. Waddell, M.D., Gregory Jamison, RPh, Noel Genova, PA, Lynne M. Weinstein, and Susan Dench, as follows:

### Introduction, Jurisdiction, and Venue

1.    This is an action seeking relief for the Defendants' retaliatory conduct in violation of the First Amendment of the United States Constitution and Article I, Section 4 of the Maine Constitution to prevent the Plaintiff from engaging in her First Amendment rights by chilling the Plaintiff's free speech and assembly.

2.    This Court has subject matter jurisdiction over Plaintiff's federal claims under its federal question jurisdiction, 28 U.S.C. § 1331.

3.    This Court has subject matter jurisdiction over Plaintiff's state law claims under its supplemental jurisdiction, 28 U.S.C. § 1367.

4.      Venue is properly laid in the District of Maine under 28 U.S.C. § 1391(b)(1)-(2) because the Defendants, in their official capacities, are governmental entities of the State of Maine, and in their individual capacities, are citizens of the State of Maine, and the substantial events and omissions giving rise to the claims occurred in the State of Maine.

**Parties**

5.      Meryl J. Nass, M.D. is a resident of Ellsworth, Maine, and is a medical doctor licensed to practice medicine in the State of Maine, but currently suspended from practice by emergency action of the BOLIM on January 11, 2022.

6.      Dr. Nass was issued a license to practice medicine in Maine on August 22, 1997 and has had no past disciplinary findings against her Maine license.

7.      The Maine Board of Licensure in Medicine (the "Board" or "BOLIM") is an agency of the State of Maine created by the Legislature under 32 M.R.S. §§ 3263 to 3269.

8.      Defendant Maroulla S. Gleaton, M.D. is a Maine resident, and a medical doctor licensed to practice medicine in Maine with an office in Augusta, Maine.  At all relevant times, she has and continues to serve as chair of the BOLIM. Defendant Gleaton is a defendant in this case in her official capacity and her individual capacity.

9.      Defendant, Holly Fanjoy, M.D. is a Maine resident, and a medical doctor, licensed to practice medicine in Maine with an office in Bangor, Maine. At all relevant times, she has and continues to serve as a member of the BOLIM. Defendant Fanjoy is a defendant in this case in her official capacity and her individual capacity.

10.      Defendant, Noah Nesin, M.D. is a Maine resident, and a medical doctor, licensed to practice medicine in Maine with an office in Bangor, Maine. At all relevant times, he has and

continues to serve as a member of the BOLIM. Defendant Nesin is a defendant in this case in his official capacity and his individual capacity.

11.     Defendant, Renee Fay-LeBlanc, M.D. is a Maine resident, and a medical doctor, licensed to practice medicine in Maine with an office in Portland, Maine. At all relevant times, she has and continues to serve as a member of the BOLIM. Defendant Fay-LeBlanc is a defendant in this case in her official capacity and her individual capacity.

12.     Defendant, Brad E. Waddell,  M.D. is a Maine resident, and a medical doctor, licensed to practice medicine in Maine with an office in Bangor, Maine. At all relevant times, he has and continues to serve as a member of the BOLIM. Defendant Waddell is a defendant in this case in his official capacity and his individual capacity.

13.     Defendant, Gregory Jamison, RPh is a Maine resident, and a registered pharmacist, in the state of Maine. At all relevant times, he has and continues to serve as a member of the BOLIM. Defendant Jamison is a defendant in this case in his official capacity and his individual capacity.

14.     Defendant, Noel Genova, PA is a Maine resident, and a Physician Assistant in the state of Maine. At all relevant times, he has and continues to serve as a member of the BOLIM. Defendant Genova is a defendant in this case in his official capacity and his individual capacity.

15.     Defendant, Lynne M. Weinstein is a Maine resident. At all relevant times, she has and continues to serve as a citizen member of the BOLIM. Defendant Weinstein is a defendant in this case in her official capacity and her individual capacity.

16.     Defendant, Susan Dench is a Maine resident. At all relevant times, she has served as a citizen member of the BOLIM. Defendant Dench is a defendant in this case in her official capacity and her individual capacity.

## Facts

17.    In Fall 2021, the BOLIM announced a so-called "Position Statement" that

licensees may face disciplinary action should they "generate and spread COVID-19 vaccine

misinformation or disinformation[:]"

FROM THE CHAIR

Covid-19 Misinformation: A Position Statement

Maroulla S. Gleaton, M.D., Chair

The Federation of State Medical Boards ("FSMB") issued the following statement in
response to a dramatic increase in the dissemination of Covid-19 vaccine
misinformation and disinformation by physicians and other health care providers:

> Physicians who generate and spread COVID-19 vaccine misinformation or
> disinformation are risking disciplinary action by state medical boards, including
> the suspension or revocation of their medical license. Due to their specialized
> knowledge and training, licensed physicians possess a high degree of public trust
> and therefore have a powerful platform in society, whether they recognize it or
> not. They also have an ethical and professional responsibility to practice medicine
> in the best interests of their patients and must share information that is factual,
> scientifically grounded and consensus-driven for the betterment of public health.
> Spreading inaccurate COVID-19 vaccine information contradicts that
> responsibility, threatens to further erode public trust in the medical profession and
> puts all patients at risk.

The American Board of Family Medicine ("ABFM"), the American Board of Internal
Medicine ("ABIM"), and the American Board of Pediatrics ("ABP") issued a joint
statement in support of FSMB's position. https://www.abim.org/media-center/press-
releases/joint-statement-on-dissemination-of-misinformation

The Maine Board of Licensure in Medicine ("BOLIM") supports the position taken
by the FSMB regarding Covid-19 vaccine misinformation spread by physicians and
physician assistants. The Board also applies this standard to all misinformation
regarding Covid-19, including non-verbal treatments and preventative measures.
Physicians and physician assistants who spread Covid-19 misinformation, or practice
based on such misinformation, erode public trust in the medical profession and may
endanger patients.

Covid-19 is a disease process which physicians and physician assistants should
evaluate and treat in the same manner as any other disease process. Assessments and
treatments of Covid-19 by physicians and physician assistants will be evaluated by

the BOLIM in the same manner it evaluates assessments and treatments of any other disease process. Treatments and recommendations regarding Covid-19 that fall below the standard of care as established by medical experts and legitimate medical research are potentially subject to disciplinary action.

Similarly, a physician or physician assistant who issues a vaccine exemption without conducting an appropriate examination and without a finding of a legitimate medical reason supporting such an exemption within the standard of care may be placing their licenses at risk of disciplinary action.

The BOLIM encourages physicians and physician assistants to address Covid-19 misinformation when encountered. The American Medical Association ("AMA") supports the fight against Covid-19 misinformation, and provides resources for physicians that explain how to counter misinformation, and why it is important to do so.

https://www.ama-assn.org/about/leadership/defeating-misinformation-key-ending-pandemic

https://www.ama-assn.org/delivering-care/public-health/surgeon-general-how-doctors-can-fight-covid-19-misinformation

https://www.ama-assn.org/system/files/2021-02/covid-19-vaccine-guide-english.pdf

18.     Per the Position Statement, physicians are encouraged to address misinformation when encountered and to utilize circulated materials from the AMA which helps "support the fight against Covid-19 misinformation[.]"

19.     The links cited in the Position Statement further solidify the BOLIM's position that questioning the COVID-19 vaccine qualifies as "misinformation."

20.     For example, in *Defeating misinformation is key in ending the pandemic*, the AMA asserts "[a]s we confront yet another major surge in COVID-19 cases and hospitalizations across the country, we are once more fighting a two-pronged war: against the virus and against rampant misinformation[,]" that the "evidence around vaccination is abundantly clear," and that "the result of this misinformation crusade is doubt, confusion and division at a time when our public response to this pandemic must be unified and resolute."

21.     In *Surgeon general: How doctors can fight COVID-19 misinformation*, there is a 56-minute YouTube video in which "experts discuss vaccine misinformation" and purport to "debunk[] existing myths" about the vaccine.

22.     In *AMA COVID-19 Guide*, there are scripts for physicians to post on social media about the vaccine; sample talking points about COVID-19 vaccine confidence, science, and public health; sample talking points about the development of the vaccine and vaccine safety; and strategies for "combatting the spread of vaccine misinformation."

23.     The BOLIM's Chair, Dr. Gleaton, has close ties to the Federation of State Medical Boards (FSMB), whose position was endorsed in the Position Statement.

24.     She is a current FSMB director and a 2020 recipient of the FSMB's distinguished service award. When running for office with the FSMB, Dr. Gleaton stressed her

> . . . clear understanding of the mission and strategic goals of the FSMB as well as its positive impact and support to state medical boards. I have the time, energy, enthusiasm and commitment necessary to work hard on behalf of the FSMB. My experience and qualifications will enable me to collaborate well with others in developing strategic goals for the FSMB in supporting medical regulation into the future.

25.     The FSMB is not a government entity, but a private organization with no regulatory authority and its own private agenda.

26.     According to its website, the FSMB maintains an "advocacy office" in Washington D.C. and advocates for federal and state policies which, in the FSMB's opinion, positively impact the health and safety of patients and the medical regulatory system.

27.     After the COVID-19 pandemic struck, Dr. Nass became a vocal commentator on many subjects related to COVID-19. She spoke and wrote publicly and extensively—on the internet, on the radio, and elsewhere.

28.     In the 1990s, Dr. Nass did extensive work on the anthrax vaccine, biological warfare and Gulf War Syndrome, and testified before Congress about the anthrax vaccine and biological warfare. Her blog, "Anthrax Vaccine," was named as such because of her work. Much of her internet speech was on that blog, although she did use other communication mediums such as Twitter.

29.     In fact, Dr. Nass has testified to Congress on six occasions and, as an acknowledged expert on anthrax and the anthrax vaccine, has been quoted in major media outlets like the New York Times, the Washington Post, the L.A. Times, and the Chicago Tribune.

30.     Dr. Nass's speech frequently involved topics like the governmental handling of the pandemic, the efficacy of masking and mask mandates, the suppression of effective medications to treat COVID-19 (such as ivermectin and hydroxychloroquine), the safety and risks of the COVID-19 vaccine, and other matters related to the pandemic. She discussed these topics on the radio, in interviews, on her blog, and elsewhere on the internet.

31.     Dr. Nass's expressed viewpoints were critical of the government, its handling of the pandemic, and the vaccine. Her viewpoints also conflicted with those asserted in the Position Statement and the resources the Position Statement identifies as useful in "support[ing] the fight against Covid-19 misinformation[.]"

32.     In short, Dr. Nass spoke on the same topics that the Position Statement encourages physicians to address, but was expressing viewpoints that the BOLIM disfavored.

33.     On or about October 6, 2021, the BOLIM received a complaint that Dr. Nass was spreading misinformation in a video and on her website. The complainant qualified, "I am not her patient. I have never been treated by Meryl Nass, nor has anyone I am associated or acquainted with."

34.     The next day, the BOLIM issued a notice of complaint to Dr. Nass via email and demanded her response by November 6, 2021.

35.     On October 10, 2021, Dr. Nass questioned the Board's authority to investigate a complaint that has nothing to do with the practice of medicine and focused entirely on a statement made in her private life. The Board responded October 14, 2021:

> The basis of the Board's jurisdiction is that there is alleged unprofessional conduct, particularly where you have communicated in your capacity as a physician in the interview and on the website that could allow patient and the public to view the information you provide as misleading and/or inaccurate.

The e-mail from Board Investigation Secretary Savannah Okoronkwo is attached hereto as **Exhibit 1**.

36.     Dr. Nass timely responded with a Nebraska Attorney General Opinion Statement that physicians cannot be disciplined for prescribing ivermectin or hydroxychloroquine off-label for treatment of COVID-19.

37.     In November 2021, Dr. Nass was invited to speak to the New Hampshire Legislature on pandemic management issues.  A copy of her testimony was provided to the BOLIM with a request to identify any "misinformation."  The BOLIM never responded to her request.

38.     On November 4, 2021, Dr. Nass appeared before the Maine Board of Pharmacy and advocated for reconsideration of Maine Board of Pharmacy Statement #CI-2021 on dispensing ivermectin.

39.     Statement #01-2021 indicated that ivermectin is not FDA-approved for treatment of COVID-19, that use of ivermectin creates a rise in poison control calls, and that pharmacists should take appropriate steps to verify that ivermectin prescriptions are issued for "legitimate

medical purposes." On information and belief, the rise in poison control calls was actually a misleading media narrative spread by the FDA to frighten people so they would not use a very safe anti-viral medication. Dr. Nass, in fact, disputed what she believed to be a false narrative. *See* https://rescue.substack.com/p/horse-bleep-how-4-calls-on-animal.

40.     The next day, Assistant Attorney General (AAG) John Nichols emailed AAG Michael Miller, stating "Below are my notes of Dr. Nass's comments before the Board of Pharmacy last night."

41.     AAGs Nichols and Miller work for the Maine Office of the Attorney General. AAG Miller is assigned to the BOLIM.

42.     AAG Miller forwarded AAG Nichols' email to Savanah Okoronkwo, an employee of the BOLIM, writing "I am forwarding this information to be included in Dr. Nass's complaint file. Thank you."

43.     Another complaint was filed against Dr. Nass on November 7, 2021 by a person in Dr. Nass's hometown of Ellsworth.

44.     A BOLIM investigator reached out to the complainant for an interview and asked her to identify patients who had seen Dr. Nass.

45.     On December 14, 2021, Dr. Nass and other physicians appeared before a group of Maine Legislators via Zoom in a meeting organized by a legislator to discuss COVID-19.

46.     The BOLIM met on January 11, 2022 in executive session to discuss Dr. Nass. Although in executive session, Dr. Nass was allowed to observe because she was the licensee being discussed. Dr. Nass made an audiotape of this meeting.

47.     BOLIM-Member Defendants Gleaton, Fanjoy, Nesin, Fay-LeBlanc, Waddell, Jamison, Genova, Weinstein, and Dench appeared and participated in the executive session.

48.     During the executive session, the BOLIM discussed the two misinformation complaints (identified as CR21-191 and CR21-210) against Dr. Nass, together with three new Assessment and Direction ("AD") matters (AD21-217, AD21-220, and AD22-1).

49.     BOLIM Member Fay-LeBlanc, who was designated by the BOLIM to present the complaints to the entire Board, stated that the reasons for the complaints "really focus around unprofessional conduct due to the spreading of misinformation about COVID-19 -- primarily on social media[,]" and especially Dr. Nass's statements during an interview with Regis Tremblay that are alleged in detail in paragraph 19 of the First Notice of Hearing dated January 24, 2022.

50.     During the interview, BOLIM Member Fay-LeBlanc explained, Dr. Nass said things that BOLIM Member Fay-LeBlanc believed were outside of mainstream medicine and involved conspiracy language around certain organizations.

51.     The three AD matters involved (1) receipt of a mandated report from a physician reporting the hospitalization of a patient Dr. Nass allegedly "diagnosed over the phone"; (2) Dr. Nass's communication to the BOLIM that she had been forced to provide misinformation to a pharmacist who had demanded to know the reason she prescribed hydroxychloroquine to Patient 2; and (3) a mandated report from a certified nurse midwife complaining about Dr. Nass having issued a prescription to a patient without consulting the certified nurse midwife.

52.     During the executive session, BOLIM Member Waddell stated, "we can collectively in our profession define what qualifies as unsubstantiated information or bad information," and that what bothers him is promoting "harmful opinions."

53.     The BOLIM ultimately consolidated all of the CR and AD matters and unanimously voted to "further investigate" by (1) issuing a complaint against Dr. Nass on the three AD matter; (2) issuing an order directing Dr. Nass to undergo a neuropsychological

evaluation under 32 M.R.S. § 3286; (3) offering Dr. Nass 24 hours to voluntarily convert her medical license to inactive status in lieu of an order of immediate suspension under 5 M.R.S. § 10004(3) and, if she declined, issuing an order of suspension; (4) subpoenaing additional records from Dr. Nass; (5) propounding a set of questions for Dr. Nass to answer related to the subject matter of the complaint within 30-days; and (6) obtaining two experts to review the complaints.

54.     BOLIM Member Fay-LeBlanc stated during the executive session that the 25-questions letter was intended to understand how Dr. Nass got to things that are "quite outside" of mainstream medicine, which could then be provided to an expert for review, and that the subpoenas would provide additional medical records that could likewise be reviewed by an expert.

55.     32 M.R.S. § 3286 authorizes the BOLIM to require a licensee to submit to a mental or physical examination when there is a complaint or allegation that a licensee "may be unable to practice medicine with reasonable skill and safety to patients *by reason of mental illness, alcohol intemperance, excessive use of drugs, narcotics, or as a result of a mental or physical condition interfering with the competent practice of medicine*." (emphasis added).

56.     There was no allegation against Dr. Nass involving mental illness, substance abuse, or other circumstances listed in Section 3286 to justify a mental examination.

57.     By ordering that Dr. Nass submit to an examination under 32 M.R.S. § 3286, and by providing this Order to the media, along with interviews with BOLIM Executive Director Dennis Smith,  upon information and belief  BOLIM falsely suggested to the public and Dr. Nass' patients that Dr. Nass was suffering from some type of mental health or other disorder and tarnished her reputation.

58.     The BOLIM's effort also reinforced to all Maine doctors that, should they voice opinions contrary to the Board's Position Statement on misinformation, as Dr. Nass had, then they too may be harassed and targeted by the BOLIM.

59.     Dr. Nass's suspension and order of evaluation were reported on repeatedly by local and national news outlets.

60.     On January 11, 2022, the BOLIM entered an Order Directing Evaluation pursuant to 32 M.R.S. § 3286, attached hereto as **Exhibit 2**. The next day, the BOLIM entered an order of immediate suspension pursuant to 5 M.R.S. § 10004(3), attached hereto as **Exhibit 3**.

61.     Each order extensively chronicled statements Dr. Nass made in public concerning the COVID-19 vaccine, the pandemic, and the governmental response to the pandemic.

62.     Put differently, the orders identified so-called "harmful opinions" discussed at the January 11, 2022 meeting.

63.     On January 12, 2022, Ms. Okoronkwo wrote Dr. Nass as follows:

> I am writing to you in my capacity as the Investigative Secretary for the Board of Licensure in Medicine ("the Board"). The Board is conducting an investigation and requests that you provide the medical records indicated on the enclosed subpoena on or before **January 27, 2022**.

The letters and subpoenas are attached hereto as **Exhibit 4**.[1]

64.     On January 13, 2022, Julie Best, the Consumer Outreach Specialist, sent Dr. Nass a letter opening, "The Maine Board of Licensure in Medicine ("Board") met on January 11, 2022 and discussed the above mentioned complaints. As a result, the Board requests you provide a written response to the following questions:" The letter is attached as **Exhibit 5**.

---

[1]     The second letter specifies two patients of Dr. Nass whose names have been redacted in this filing.

65.     The letter goes on to list 26 questions, many of which are compound or have subparts. For example, the second[2] Question 1 includes eight subparts and, at the end, says "Please provide explanations."

66.     In all, the January 13, 2022 letter includes nearly 50 questions for Dr. Nass to answer, some of which require her to provide data or documentation supporting her answers.

67.     Many of the questions quote a public statement by Dr. Nass and demanded that she explain the evidence or support for her statement. Others demand information or evidence on topics about which Dr. Nass has commented publicly.

68.     During the executive session, BOLIM Member Fay-LeBlanc referred to *her* list of 25 questions, thus, upon information and belief, the questions in the so-called 25-question letter were largely drafted by her.

69.     Upon information and belief, the letter and questions were designed to elicit information to undermine Dr. Nass's public statements, provide leads for potential sources of other complaints against Dr. Nass; and otherwise harass and retaliate against Dr. Nass.

70.     According to the letter, Dr. Nass's responses were due within 30 days of receipt of the letter.

71.     On January 24, 2022, the BOLIM issued a Notice of Hearing, attached as **Exhibit 6**, which was superseded on March 22, 2022 by an Amended Notice of Hearing on March 22, 2022, attached hereto as **Exhibit 7**. A notice of hearing is essentially the charging instrument when a doctor faces disciplinary action.

72.     Similar to the Order Directing Evaluation and Order of Immediate Suspension, the Amended Notice of Hearing extensively chronicled statements Dr. Nass made in public

---

[2]     There are two questions listed as "1." in the letter.

concerning the COVID-19 vaccine, the pandemic, and the governmental response to the

pandemic.  Dr. Nass informed the BOLIM that the statements in paragraph 73 below are accurate

and scientifically supported.

73.    For example, the Amended Notice of Hearing quotes Dr. Nass as saying:

A.  That she "did not intend to comply with masking and vaccine orders[.]"

B.  That the federal government "won't let us find out" how many people are
immune from less severe or asymptomatic COVID cases and the federal
government has "basically prohibited the use of normal tests of immunity,
normal antibody, T cell tests, etc., or some pattern of those", and "instead we
all have to be vaccinated" and that "doesn't make scientific or medical sense[.]"

C.  "[T]he more doses of vaccine, the more shots you get the greater the risk of
adverse reactions[.]"

D.  "[I]f you're going to get myocarditis over 80% get it after the second dose, not
after the first dose" and "people who got it after the first dose, many of them
had already been infected with COVID[.]"

E.  "[I]f we are doing this for people's health it would be very important to identify
how many people are immune and they don't have to worry about masks ... they
don't have to worry about distancing, they don't have to worry about
vaccination. They are immune. We know so far that those people have broad
and very durable long-term immunity. As best we know ... they're very immune
a year after they had the infection[.]"

F.  "[S]o the FDA was forced to issue a license for the Pfizer vaccine for certain
people and yet there is no Comirnaty vaccine in the United States, so there are

14

no vials of licensed Pfizer vaccines in the United States. The FDA did a bait and switch[.]"

G.  "[W]hy is the federal government so interested in getting everyone vaccinated? It seems that one probable reason is unless you get people vaccinated and you have to give them boosters every so often there is no logical justification for vaccine passports ... which is probably going to be your electronic ID, and probably will mediate your financial transactions, will identify where you are any time, etc., you know will have broad uses for increased control and surveillance. There may be other reasons. I mean there may be things in these vaccines that the government wants to inject in us[.]"

H.  "[B]ut obviously vaccinating people who are already immune and have much better immunity than you would get from these vaccines that are extremely weak and short lived in what they give you, and dangerous with many potential serious side effects, and 14,000 deaths reported to the federal VAERS system in the 8 to 10 months we have been vaccinating people, not quite 10 months, the vaccines are a problem[.]"

I.  "[W]e're vaccinating for a virus that is gone. We have no benefit from the mRNA, we have only problems from it[.]"

J.  "[T]he vaccines don't work very well, so there are loads of people who are getting infected who've been vaccinated almost at the same rate as the vaccinated[.] [sic]"

K. "[T]he governments seem to think they own our children because they are vaccinating children age 12 and up without parental permission in many parts of the United States[.]"

L. "[C]hildren have the worst side effect profile, and they get the least benefit from the vaccines. So you are either vaccinating them to try and, you know, stop it spreading in children so adults don't get it, because if children are getting a cold, you don't vaccinate kids against colds, we never have before, or you are vaccinating them for some other nefarious reason[.]"

M. "[T]he DNA from the adenovirus could potentially become a part of our DNA ... the human beings we're the guinea pigs for these vaccines[.]"

N. "[T]here are drugs like ivermectin, hydroxychloroquine, chloroquine, mefloquine, and others that are quite effective against this virus, that will kill off the virus the first week you have it when virus is still growing[.]"

O. Operation Warp Speed is the result of an agenda that "seems to be the same one that has been in play since 2001, you know, the 9/ 11. Which is increased surveillance, right, increased central control, and some blurring of national borders and national sovereignty, which we haven't seen much of yet but the close collusion of many countries with the same program indicates that there is international collusion going on at high levels[.]"

P. "[T]he people who are not getting vaccinated are tending to be the most educated, the wealthiest[.]"

Q. That "Dr. Nass posted on her blog anthraxvaccine.blogspot.com and/or her website merylnassmd,com [sic]: 'if you did not know the CDC was a criminal

16

agency by now, this ought to get you going. Remember COVID vaccines are associated with high rates of miscarriages[.]"

R.  That Dr. Nass stated on Twitter that a patient informed consent form for hydroxychloroquine used at a hospital was a form "designed to scare patients from using a safe drug that works well for COVID by making false claims. The form therefore can only result in injuries and possibly deaths[.]"

74.  The Amended Notice of Hearing included four potential grounds for discipline based upon Dr. Nass's speech:

I.     Pursuant to 32 M.R.S. § 3282-A(2)(E)(1) for incompetence by engaging in conduct that evidences a lack of ability or fitness to discharge the duty owed by the licensee to a patient.

II.    Pursuant to 32 M.R.S. § 3282-A(2)(E)(2) for incompetence by engaging in conduct that evidences a lack of knowledge or inability to apply principles and skills to carry out the practice for which the licensee is licensed.

. . .

XVI.   Pursuant to 32 M.R.S. § 3282-A(2)(F) for engaging in unprofessional conduct by violating a standard of professional behavior that has been established in the practice of medicine by engaging in disruptive behavior. "Disruptive behavior" means aberrant behavior that interferes with or is likely to interfere with the delivery of care.

XVII.  Pursuant to 32 M.R.S. § 3282-A(2)(F) for engaging in unprofessional conduct by violating a standard of professional behavior that has been established in the practice of medicine as set forth in AMACME Opinion 2.3.2 Professionalism in the Use of Social Media.

75.  The Board Staff's Amended Notice of Hearing also sought to discipline Dr. Nass for allegedly violating standards or opinions issued by the American Medical Association (AMA), a private organization.

76.     The Amended Notice of Hearing alleged AMA-related violations as follows:

III.     Pursuant to 32 M.R.S. § 3282-A(2)(F) for engaging in unprofessional conduct by violating a standard of professional behavior that has been established in the practice of medicine as set forth in American Medical Association Code of Medical Ethics ("AMACME") AMACME Opinion 1.2.11 Ethically Sound Innovation in Medical Practice.

. . .

X.     Pursuant to 32 M.R.S. § 3282-A(2)(F) for engaging in unprofessional conduct by violating a standard of professional behavior that has been established in the practice of medicine as set forth in AMACME Opinion 3.3.1 Management of Medical Records.

. . .

XV.     Pursuant to 32 M.R.S. § 3282-A(2)(F) for engaging in unprofessional conduct by violating a standard of professional behavior that has been established in the practice of medicine by violating her ethical responsibility to be honest in all professional interactions as set forth in the American Medical Association Code of Medical Ethics ("AMACME") Principle II.

. . .

XVII. Pursuant to 32 M.R.S. § 3282-A(2)(F) for engaging in unprofessional conduct by violating a standard of professional behavior that has been established in the practice of medicine as set forth in AMACME Opinion 2.3.2 Professionalism in the Use of Social Media. (*Id.* ¶¶ III, X, XV, XVII.)

77.     The subpoenas and notices of hearing are signed by Dennis Smith as Executive Director of the Maine Board of Licensure in Medicine.

78.     On September 7, 2022, Dr. Nass moved to dismiss the complaint, arguing that the BOLIM's attempt to punish her for speaking violated her free speech rights.

79.     The BOLIM responded to the motion to dismiss by withdrawing all grounds for discipline expressly based on Dr. Nass's speech, and fully dismissed Grounds III, X, XV, XVI, and XVII. The BOLIM also amended Grounds I and II to specifically name Patients 1, 2 and 3.

The Notice of Withdrawal and Second Amended Notice of Hearing are attached hereto as **Exhibits 8 and 9**.

80.    Considering the withdrawal of the "misinformation" allegations, Dr. Nass moved the BOLIM to vacate its order of evaluation and interim suspension. The BOLIM voted on October 11, 2022, without any deliberation or discussion, to deny these motions. This decision has left Dr. Nass suspended without a hearing conclusion for nineteen (19) months.

81.    The remaining grounds for discipline against Dr. Nass are frivolous and serve as a mere pretext for punishing Dr. Nass for her speech.

82.    The remaining grounds for discipline are summarized as:

A. **Patient Care and Competence to Practice Medicine (Grounds I, II, IV-VI, VII & IX)**: That Dr. Nass prescribed hydroxychloroquine and ivermectin to Patients 1, 2, and 3 (Grounds I and II); and that she did not comply with telemedicine when treating Patients 1, 2, and 3 (Grounds IV-VI, VII & IX).

B. **Telemedicine (Grounds XI - XIII):** That Dr. Nass's medical records with respect to Patients 1, 2, and 3 did not meet applicable rules.

C. **Truth Telling and Misrepresentation (Ground XIV):** That Dr. Nass provided misinformation to a pharmacist who demanded to know the purpose of a prescription.

D. **Additional Alleged Violations (Ground XVII – XIX):** That Dr. Nass did not respond to a list of questions propounded by the Board Staff on 1/13/2022, declining through her counsel to answer the questions; and that she did not respond to two subpoenas propounded on her.

83.    The Third Notice of Hearing continued to allege, "The FDA has not authorized or approved the use of Ivermectin for use in preventing or treating Covid-19 in humans." On information and belief, the BOLIM knew this to be a misleading statement because the FDA has no legal authority to disapprove the long-standing and recognized practice of off-label prescribing.  In fact, the FDA website since at least February 5, 2018 has stated, "From the FDA perspective, once the FDA approves a drug, healthcare providers generally may prescribe the

drug for an unapproved use when they judge that it is medically appropriate for their patient."

*https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/understanding-unapproved-use-approved-drugs-label*.

84.     Indeed, on August 8, 2023, an attorney with the Department of Justice who was representing the FDA stated during oral arguments before the United States Court of Appeals for the Fifth Circuit in *Apter, et al. v. Department of Health and Human Services, et al.*, Case No. 22-40802, that doctors have the authority to prescribe ivermectin to treat Covid-19. She stated, "[h]ere, the FDA was not regulating the off-label use of drugs . . . The FDA explicitly recognizes that doctors do have the authority to prescribe ivermectin to treat COVID."

85.     The BOLIM subpoenaed the medical records of Patients 1, 2, and 3 without pre- or post-subpoena notification to Patients 1, 2, or 3.

86.     Using Patient medical records, the BOLIM alleged additional disciplinary counts against Dr. Nass for violating certain telehealth guidelines involving the care of Patients 1, 2, and 3.

87.     No member or staff from the BOLIM ever communicated with Patients 1, 2, and 3.

88.     Patients 1, 2, and 3 were not informed by the BOLIM that Dr. Nass was alleged to have provided care without compliance with certain BOLIM rules.

89.     In fact, each patient testified before the BOLIM on July 28, 2023 that Dr. Nass provided excellent care and complimented her care and expertise during their COVID consultation and her subsequent advice regarding the patient's illness.

90.     The fact the BOLIM brought formal disciplinary charges without interviewing the Patients substantiates Defendants' retaliatory animus against Dr. Nass.  The BOLIM micro

analyzed Dr. Nass's medical records of Patients 1, 2, and 3 to find technical fault with her care in spite of the fact that no patient had filed a complaint, and all patients testified before BOLIM that her advice and medical support were excellent.

91.     The alleged faults committed by Dr. Nass, including failure to follow Maine telemedicine guidelines, inability to comprehend the medical literature, incomplete medical records, failure to properly communicate with patients, etc., were all shown to be without merit during testimony of Board and licensee experts and testimony of the three patients at issue.

92.     The fact that the BOLIM has maintained a 19-month interim suspension of Dr. Nass, despite the modest nature of the remaining grounds, substantiates Defendants' retaliatory animus against Dr. Nass.

93.     In the ongoing adjudicatory hearing, the Board's zealous effort to prosecute Dr. Nass is exemplified by the fact that it is flaunting its own expert witness policy to do so.

94.     According to the BOLIM's policy, expert witnesses may be paid a maximum of $125 per hour for non-hearing time and $175 per hour for testimony.

95.     The BOLIM has made a special exception to this policy by paying one of its experts, Dr. Jeremy Faust, $500 per hour to testify against Dr. Nass.

96.     According to documents obtained from the BOLIM under the Maine Freedom of Access Act, in order to secure the payments to pay Dr. Faust, the BOLIM represented to the Maine Department of Procurement Services in its Blanket Contract Justification & Amendment Form that experts are paid a "maximum" of $175 per hour for time attending hearing and $125 hour for consultation and preparation time.

97.     When making those representations to another Maine state agency, the BOLIM

had already paid Dr. Faust $10,500 at his $500 per hour rate and intended to continue paying Dr.

Faust $500 per hour for future services.

98.     Not only did the BOLIM pay Dr. Faust substantially more than its own policy

allows, it also hired Dr. Faust even though he was neither in the same specialty as Dr. Nass nor a

Maine practitioner, each of which are required by the BOLIM's expert witness guidelines.

99.     The fact that the BOLIM is violating its own expert witness policies and

misleading another Maine state agency substantiates its retaliatory animus against Dr. Nass.

100.    Dr. Gleaton is a member of the Board of the Federation of State Medical Boards,

a private advocacy organization.

101.    Dr. Gleaton's FSMB Board membership is a policy-setting leadership position

within the organization.

102.    Dr. Gleaton's FSMB Board membership facially violates the Conflict of Interest

Policy for Governor's Appointees to Licensing Boards and Commissions.  The Conflict of

Interest Policy provides:

> To safeguard the integrity of the licensing system and the ability of
> board members to act in an impartial manner, individuals holding
> leadership positions in their professional or trade association may
> not be considered for appointment as a licensing board member
> unless they resign their professional association leadership
> positions.  Further, appointed board members may not hold such
> leadership positions for the term of appointment to a licensing board
> or commission.  Board members who accept leadership positions in
> professional associations shall resign their board member positions
> before taking office in a professional association.
>
> Professional and trade associations serve the best interests of the
> profession whereas a professional licensing board serves only the
> best interests of the public at large.  This policy is designed to avoid
> any conflict of interest or even the appearance of a conflict of
> interest, between the profession and the regulatory body and to

> clarify for the public the distinction between a licensing entity
> serving the public and the professional association that serves the
> profession.

(Conflict of Interest Policy for Governor's Appointees to Licensing Boards and Commissions

within and affiliated with the Department of Professional and Financial Regulation, attached as

**Exhibit 10.**)

103.    Despite her clear conflict of interest posed by her status with the Federation of

State Medical Boards, and that organization's political agenda to chill speech expressing certain

viewpoints as reflected in the Position Statement, Dr. Gleaton has twice denied a request to

disqualify herself from the adjudicatory hearing involving Dr. Nass.

104.    During the hearing, which is being conducted via Zoom, Dr. Gleaton has been

observed either sleeping or feigning sleeping, laughing, grinning, making exaggerated looks of

astonishment, or headshaking during cross examinations conducted by Dr. Nass's counsel.

105.    At one point of the hearing, when Dr. Nass's counsel was examining the

BOLIM's expert about whether physicians were prescribing animal ivermectin to people, Dr.

Gleaton muttered "it's the same drug" out of turn.

106.    The hearing officer started admonishing Dr. Nass, mistakenly thinking that Dr.

Nass was the one who spoke out-of-turn.

107.    But Dr. Gleaton did nothing in response, other than mute her device which she

had apparently left on inadvertently.

108.    Dr. Gleaton only confessed to being the culprit of the statement after the court

reporter indicated that it was Dr. Gleaton who spoke out-of-turn.

109.    The fact that Dr. Gleaton was willing to let Dr. Nass take the fall for her misconduct, until being called out herself, is suggestive of animus against Dr. Nass and substantiates Dr. Nass's retaliation claims.

110.    Likewise, the fact that the BOLIM tried to expressly discipline Dr. Nass for her speech substantiates the retaliatory animus of the BOLIM and its members.

111.    Dr. Nass intends to enjoy her free speech rights, including engaging in speech critical of the governmental handling of the COVID-19 pandemic, the safety and efficacy of the COVID-19 vaccine, alternative treatments for COVID-19, and the BOLIM's pretextual effort to punish her for her speech.

112.    Dr. Nass has a reasonable, objective fear of prosecution under 32 M.R.S. § 3282 for her speech. The Position Statement expressly threatens doctors with disciplinary action if they "generate and spread COVID-19 vaccine misinformation or disinformation." The BOLIM carried through on that threat by prosecuting Dr. Nass for criticizing the COVID-19 vaccine and the governmental response to the pandemic. And even now, the BOLIM is continuing with an overzealous and pretextual effort to suspend her medical license on trivial and baseless grounds.

113.    Although the BOLIM dismissed the misinformation grounds against Dr. Nass, nothing prevents it from re-commencing disciplinary action against Dr. Nass for her prior speech, or commencing disciplinary proceedings for her future speech that the BOLIM decides contradicts the BOLIM's Position Statement.  The BOLIM Position Statement continues to chill Dr. Nass's First Amendment protected speech and the speech of other doctors fearful of the BOLIM's threatened discipline.

114.     Dr. Nass's statements to the public about the COVID-19 related topics were reasonable and protected speech considering the novelty of the virus and relied on available medical literature, even if those statements conflicted with the BOLIM's preferred viewpoints.

115.     Dr. Nass has by now been suspended from practicing medicine for over 19 months.

116.     Prior to her suspension, Dr. Nass had spoken to a governor, attorneys general of several states, and multiple state legislatures throughout the country about pandemic policies and vaccine mandates; on information and belief this made her an ideal person to target and make an example of.

117.     The Defendants' foregoing conduct constitutes harassment and retaliation against Dr. Nass for expressing viewpoints with which the Defendants disagree.

<u>**Count 1**</u>
**42 U.S.C. § 1983 and Declaratory Judgment: First Amendment Challenge**
**(Defendant BOLIM)**

118.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 to 117 as if set forth fully herein.

119.     The First Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech, or the press[.]" The First Amendment is applicable to the States through the Fourteenth Amendment.

120.     Like other speakers, doctors are allowed to have opinions and to share those opinions with the public: "outside the doctor-patient relationship, doctors are constitutionally equivalent to soapbox orators and pamphleteers, and their speech receives robust protection under the First Amendment." *Pickup v. Brown*, 740 F.3d 1208, 1227-28 (9th Cir. 2014).

121.    32 M.R.S. § 3282-A, as construed by the Position Statement and as applied to Dr. Nass, serves as an instrument to crush dissenting views and chill disfavored speech. In short, the BOLIM's use of these statutes constitutes both a content-based and viewpoint-based restriction on speech.

122.    The BOLIM's construction and application of 32 M.R.S. § 3282-A also abridges core political speech, which occupies "the highest, most protected position" in the hierarchy of constitutional protection of speech. *R. A. V. v. St. Paul*, 505 U.S. 377, 422 (1992) (Stevens, J., concurring).

## Count 2
### 42 U.S.C. § 1983 and Declaratory Judgment: Vagueness Challenge
### (Defendant BOLIM)

123.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 to 122 as if set forth fully herein.

124.    A law is unconstitutionally vague if it does not give "a person of ordinary intelligence fair notice of what is prohibited" or if it is "so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). A law can be impermissibly vague if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits[,]" or if it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *Chicago v. Morales*, 527 U.S. 41, 56-57 (1999)).

125.    32 M.R.S. § 3282-A, as construed by the Position Statement and as applied to Dr. Nass, is unconstitutionally vague because it fails to provide fair notice to a reasonable person of what constitutes "misinformation or disinformation," and because it encourages the BOLIM to engage in arbitrary and discriminatory enforcement practices.

**Count 3**
**42 U.S.C. § 1983: First Amendment Retaliation**
**(All Defendants)**

126.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 to 125 as if set forth fully herein.

127.    Plaintiff engaged in protected activity under the First Amendment; specifically, engaging in public speech about and reporting on the COVID-19 vaccine, the COVID-19 pandemic and its treatment, the governmental response to the pandemic, and related topics.

128.    The subjects about which she was speaking were and continue to be matters of public concern, and topics of robust medical and political debate and disagreement.

129.    Defendants' foregoing actions against the Plaintiff were intended to retaliate against her for the exercise of First Amendment rights and to chill future exercise of First Amendment rights.

130.    Defendants' misconduct against the Plaintiff occurred because of her exercise of a protected activity under the First Amendment.

131.    At all relevant times, Defendants were acting under color of law.

132.    At all relevant times, Defendant BOLIM was acting pursuant to policy, custom, or practice of exercising its licensing authority against licensees whom the BOLIM perceives as spreading or generating "misinformation."

133.    Plaintiff's right to be free from retaliation because of the exercise of her right of freedom of speech, the right to peacefully assemble, and the right to address grievances to the government is clearly established.

134.     Defendants' foregoing acts were not adjudicative, i.e., acts that are ordinarily performed by a judge; nor was the BOLIM involved in the adjudication of disputes or rights between parties.

135.     As evidenced by statements made during the January 11, 2022 executive session, Defendants perceived their retaliatory conduct to be "investigative"—that is, ostensibly to reveal or uncover evidence pertaining to existing complaints or which might serve as a basis for new complaints.

136.     To the extent any of Defendants' actions are found to enjoy adjudicatory immunity or any other immunity, the plain language of Section 1983 does not demonstrate an intent to extend absolute or qualified immunity to members of medical or licensing boards; the legislative history of Section 1983 does not evidence an intent to extend such immunity to medical or licensing boards; and Defendants would not have been entitled to any immunity defenses available under the common law at the time of the enactment of Section 1983.

**Count 4**
**Declaratory Judgment: Maine Constitutional Violation**
**(Defendant BOLIM)**

137.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 to 136 as if set forth fully herein.

138.     The Maine Constitution, Art. I, Section 4, provides, in pertinent part, "Every citizen may freely speak, write and publish sentiments on any subject, being responsible for the abuse of this liberty" and "no laws shall be passed regulating or restraining the freedom of the press."

139.     The Maine Constitution likewise provides all persons with due process of law. Me Const., Art. I, Sec. 6-A.

140.    The Plaintiff was engaged in freedom of speech activities entitled to protection under the Maine Constitution. *Central Maine Power v. Public Utilities Commission,* 1999 ME 199, ¶ 8, 734 A.2d 1120, 1125 (Me. 1999).

141.    The Plaintiff's right to receive information is a proper component of the concept of free speech under the Maine Constitution. *Brophy v. Town of Castine*, 534 A.2d 663, 664 (Me. 1987).

142.    The right of freedom of speech, the right to peacefully assemble, and right to address grievances to the government are clearly established in Maine jurisprudence.

143.    32 M.R.S. § 3282-A, as construed by the Position Statement and as applied to Dr. Nass, serves as an instrument to crush dissenting views and chill disfavored speech. In short, the BOLIM's use of these statutes constitutes both a content-based and viewpoint-based restriction on speech in violation of the Maine Constitution.

144.    32 M.R.S. § 3282-A, as construed by the Position Statement and as applied to Dr. Nass, is unconstitutionally vague under the Maine Constitution because it fails to provide fair notice to a reasonable person of what constitutes "misinformation or disinformation," and because it encourages the BOLIM to engage in arbitrary and discriminatory enforcement practices.

### Count 5
### Maine Civil Rights Act Violation, 5 M.R.S. § 4681, et seq.
### (All Defendants)

145.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 to 144 as if set forth fully herein.

146.    Plaintiff engaged and enjoyed rights secured by the United States Constitution and the Maine Constitution; specifically, engaging in public speech about and reporting on the

COVID-19 vaccine, the COVID-19 pandemic, the governmental response to the pandemic, and other related topics.

147.    Defendants intentionally interfered with or attempted to interfere with Plaintiff's exercise or enjoyment of those rights by, among other things, threatening to interfere with Plaintiff's property interest in her privilege to practice medicine in the State of Maine.

148.    Defendants' foregoing actions against the Plaintiff were intended to retaliate against her for the exercise of rights protected by the United States and Maine Constitutions, and to chill future exercise of rights protected by the United States and Maine Constitutions.

149.    At all relevant times, Defendants were acting under color of law.

150.    At all relevant times, Defendant BOLIM was acting pursuant to policy, custom, or practice of exercising its licensing authority against licensees whom the BOLIM perceives as spreading or generating "misinformation."

151.    Defendants' conduct against the Plaintiff was causally connected to her exercise of a protected activity under the First Amendment and the Maine Constitution.

152.    Plaintiff's right to be free from retaliation because of the exercise of her right of freedom of speech, the right to peacefully assemble, and right to address grievances to the government is clearly established.

**Count 6**
**Punitive Damages**
**(Individual Defendants)**

153.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 to 152 as if set forth fully herein.

154.    Defendants, in their individual capacities, violated Plaintiff's rights under the United States Constitution and the Maine Constitution.

155.    The conduct of the Defendants was done with callous or reckless indifference to the rights of the Plaintiff.

156.    The conduct of the Defendants was motivated by evil motive or intent toward the Plaintiff.

157.    The conduct of the Defendants was done in a manner that was malicious, oppressive, outrageous, reckless, wanton, and willful, and demonstrated actual or implied malice toward the Plaintiff.

158.    The Plaintiff is entitled to punitive damages in accordance with the principles set forth in *Smith v Wade*, 461 U.S. 30 (1983) and *Tuttle v Raymond,* 494 A.2d 1353 (1985).

## Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that this Court:

A.    Declare that 32 M.R.S. § 3282-A violates the First and Fourteenth Amendments to the Constitution as construed by the Position Statement and as applied to Plaintiff.

B.    Permanently restrain Defendants from enforcing 32 M.R.S. § 3282-A as construed by the Position Statement and as applied to Plaintiff or others similarly situated.

C.    Require the BOLIM to retract the Position Statement.

D.    Permanently restrain Defendants from retaliating against Plaintiff for exercising rights secured by the United States.

E.    Award Plaintiff all damages authorized by law to the extent and not barred by the Eleventh Amendment, including but not limited to compensatory and punitive damages.

F.    Award Plaintiff her reasonable attorney fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and 14 M.R.S. § 4683, and other applicable law.

G.    Grant such further and other relief as the Court deems appropriate.

**Demand for Jury Trial**

Plaintiff demands a jury trial on all counts so triable.


Date: August 16, 2023                    /s/ Gene R. Libby_____
                                          Gene R. Libby, Esq. (Bar No. 427)

                                          /s/ Tyler J. Smith_____
                                          Tyler J. Smith, Esq. (Bar No. 4526)

                                          /s/ Michael E. Saucier_____
                                          Michael E. Saucier, Esq. (Bar No. 353)

LIBBY O'BRIEN KINGSLEY & CHAMPION, LLC
62 Portland Road, Suite 17
Kennebunk, ME 04043
(207) 985-1815
glibby@lokllc.com
tsmith@lokllc.com
msaucier@lokllc.com