UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

MERYL J. NASS, M.D.,           )
                                     )
          Plaintiff,       )
                                     )
v.                             )        1:23-cv-00321-LEW
                                     )
MAINE BOARD OF LICENSURE     )
IN MEDICINE et al.,          )
                                     )
          Defendants.     

## <u>ORDER ON DEFENDANTS' MOTION TO DISMISS</u>

The Maine Board of Licensure in Medicine (the "Board") conducted disciplinary proceedings against Meryl J. Nass, M.D., for making public statements about COVID-19, its treatment, and the federal response to the pandemic that were inconsistent with its stated position barring physicians from spreading "COVID-19 vaccine misinformation." Complaint ¶ 17 (ECF No. 1). The Board suspended Dr. Nass's license to practice medicine during those proceedings, which are ongoing. Nass initiated this matter to bring federal and state constitutional claims and a state statutory claim against the Board and several of its members (the "Individual Defendants").[1] The matter is now before the Court on the Defendants' Motion to Dismiss (ECF No. 14). Because *Younger* abstention restrains me from exercising jurisdiction over this matter while the Board's disciplinary proceedings

---

[1] The Individual Defendants are: Maroulla S. Gleaton, M.D.; Holly Fanjoy, M.D.; Noah Nesin, M.D.; Renee Fay-LeBlanc, M.D.; Brad E. Waddell, M.D.; Gregory Jamison, RPh; Noel Genova, PA; Lynne M. Weinstein; and Susan Dench.

remain ongoing, I grant in part the Defendants' Motion, as outlined in the conclusion of this order.

## BACKGROUND

This background narrative is drawn principally from the Complaint and its attachments, and the allegations found in the Complaint are taken as true for the purpose of evaluating the motion to dismiss. *García-Catalán v. United States*, 734 F.3d 100, 102 (1st Cir. 2013); *see also Trans-Spec Truck Serv.*, *Inc. v. Caterpillar*, *Inc.*, 524 F.3d 315, 321 (1st Cir. 2008) ("Exhibits attached to the complaint are properly considered part of the pleading 'for all purposes,' including Rule 12(b)(6)." (quoting Fed. R. Civ. P. 10(c))); *cf. Gonzalez v. United States*, 284 F.3d 281, 288 (1st Cir. 2002) ("The attachment of exhibits to a Rule 12(b)(1) motion does not convert it to a Rule 56 motion."). The background narrative is also informed by information related to the progress of the state proceedings, provided by the Office of the Maine Attorney General in advance of oral argument on the Motion to Dismiss. (*See* ECF No. 20.)

Meryl J. Nass is a medical doctor who resides in Ellsworth, Maine. The Maine Board of Licensure in Medicine first licensed Dr. Nass to practice medicine in 1997. During the pandemic, Nass commented publicly about subjects related to COVID-19. She criticized the government's handling of the pandemic, including what she viewed as the "suppression of effective medications to treat COVID-19," like ivermectin and hydroxychloroquine. Compl. ¶ 30. Nass also questioned the safety of vaccines and the efficacy of mask mandates. Nass disseminated her opinions online, through her blog and

on Twitter, over the radio, in testimony to state legislatures, and in conversation with other state-level officials.

In the fall of 2021, the Board issued a "Position Statement" explaining that licensees could face disciplinary action for spreading "misinformation and disinformation" about COVID-19 vaccines.  Compl. ¶ 17.  The Position Statement endorsed a statement issued by the Federation of State Medical Boards ("FSMB")[2] that identified license suspension and revocation as potential consequences for spreading COVID-19 misinformation.  The Position Statement also featured several links to "resources for physicians [from the American Medical Association] that explain how to counter misinformation, and why it is important to do so."  Compl.  ¶ 17.  The viewpoints that Nass expressed about COVID-19 frequently "conflicted with those asserted in the Position Statement and the resources the Position Statement identifies as useful."  Compl. ¶ 31.

On or about October 26, 2021, the Board received a complaint that Nass was spreading misinformation in a video and on her website.  A day later, the Board issued a notice of complaint to Nass and directed her to respond.[3]  The Board received a second

---

[2] The Complaint describes the Federation of State Medical Boards as a "private organization with no regulatory authority and its own private agenda" and explains that the Chair of the Maine Board of Licensure in Medicine has "close ties" to the organization, including a "policy-setting leadership position." Compl. ¶¶ 23, 25, 101.  The Chair of the Board has twice denied requests to disqualify herself from Nass's disciplinary proceedings.

[3] After receiving the notice, Nass questioned the Board's authority to investigate the complaint, which she characterizes as focusing on "a statement made in her private life." Compl. ¶ 35.  An Investigative Secretary for the Board responded in part as follows:

> The basis here for the Board's jurisdiction is that there is alleged unprofessional conduct, particularly where you have communicated in your capacity as a physician in the interview and on the website that could allow for patients and the public to view the information you provide as misleading and/or inaccurate.

Compl. Ex. 1 at 1 (ECF No. 1-1).

complaint about Nass on November 7, 2021.  Supplementing those complaints were notes, prepared and submitted by attorneys at the Office of the Maine Attorney General, summarizing Nass's comments before the Maine Board of Pharmacy on November 7, 2021, urging it to reconsider guidance on dispensing ivermectin.

The Defendant Board met in executive session on January 11, 2022, with Nass attending as an observer.  The Board discussed the two complaints against Nass, which one Board member, Defendant Fay-LeBlanc, summarized as "focus[ing on] unprofessional conduct due to the spreading of misinformation about COVID-19—primarily on social media."  Compl. ¶ 49.  The Board also discussed three new "Assessment and Direction" matters concerning Nass: two arising from mandated reports from health providers and a third involving a communication from Nass to the Board.[4]  Compl. ¶ 48.  The Board voted unanimously to "further investigate" the allegations by, among other things, directing Nass to undergo a neuropsychological evaluation (Compl. Ex. 2; ECF No. 1-2);[5] suspending her

---

[4] The Complaint describes the three Assessment and Direction matters as follows:

> The three [Assessment and Direction] matters involved (1) receipt of a mandated report from a physician reporting the hospitalization of a patient Dr. Nass allegedly "diagnosed over the phone"; (2) Dr. Nass's communication to the [Board] that she had been forced to provide misinformation to a pharmacist who had demanded to know the reason she prescribed hydroxychloroquine to Patient 2; and (3) a mandated report from a certified nurse midwife complaining about Dr. Nass having issued a prescription to a patient without consulting the certified nurse midwife.

Compl. ¶ 51.

[5] The Board issued the Order Directing Evaluation pursuant to a Maine statute that provides in part:

> Upon its own motion or upon complaint, the board, in the interests of public health, safety and welfare, shall treat as an emergency a complaint or allegation that an individual licensed under this chapter is or may be unable to practice medicine with reasonable skill and safety to patients by reason of mental illness, alcohol intemperance, excessive use of drugs, narcotics or as a result of a mental or physical condition interfering with the competent practice of medicine.  In enforcing this paragraph, the board may compel a

medical license (Compl. Ex. 3; ECF No. 1-3); subpoenaing patient records (Compl. Ex. 4; ECF No. 1-4); requesting that Nass answer written questions about the complaints that the Board received (Compl. Ex. 5; ECF No. 1-5); and issuing a complaint of its own against Nass as to the three Assessment and Direction matters.  Compl. ¶ 53.

On January 24, 2022, the Board issued a Notice of Hearing (Compl. Ex. 6; ECF No. 1-6), which acts as a charging instrument for a physician facing disciplinary action.  The Board issued an Amended Notice of Hearing on March 22, 2022 (Compl. Ex. 7; ECF No. 1-7) that superseded its precursor.  The Amended Notice of Hearing documented many of Nass's public statements about COVID-19 vaccines, the pandemic, and the government's response to the pandemic.  The Amended Notice of Hearing also listed nineteen potential grounds for disciplinary action.  After Nass moved to dismiss the proceedings for violating her free speech rights, the Board withdrew several grounds for disciplinary action (Compl. Ex. 8; ECF No. 1-8) and issued a Second Amended Notice of Hearing on September 26, 2022 (Compl. Ex. 9; ECF No. 1-9).  The Second Amended Notice of Hearing retains thirteen of the grounds for disciplinary action that the Board asserted initially.[6]  Each

---

physician to submit to a mental or physical examination by a physician or another person designated by the board. . . .

For the purpose of this chapter, by practicing or by making and filing a biennial license to practice medicine in this State, every physician licensed under this chapter who accepts the privilege to practice medicine in this State is deemed to have given consent to a mental or physical examination when directed in writing by the board and to have waived all objections to the admissibility of the examiner's testimony or examination reports on the grounds that the testimony or reports constitute a privileged communication.

32 M.R.S. § 3286.  There was no allegation against Nass related to substance abuse or mental illness.

[6] The Second Amended Notice of Hearing also included some additional references to "Patients 1, 2, and/or 3."  *See, e.g.*, Compl. Ex. 9 at 1.  The Board reviewed the referenced patients' medical records but did not interview the patients before bringing the disciplinary charges.  Each referenced patient later testified that Nass provided excellent care.

potential ground for disciplinary action cites a subsection of 32 M.R.S. § 3282-A(2) as support for the Board's authority.[7]   Nass moved to vacate the Board's evaluation and suspension orders, which the Board summarily denied without deliberation or discussion on October 11, 2022.   The Complaint, which characterizes the disciplinary proceeding underlying this case as including an "ongoing adjudicatory hearing," criticizes the Defendants' conduct in several respects.   Compl. ¶ 93.   For one, the Board deviated from its expert witness policy by hiring an out-of-state practitioner with a different specialty than Nass to testify against her.   The Board also made exception to the policy by paying that

---

[7] Specifically, the Second Amended Notice of Hearing cites the following subsections of the statute:

> **2. Grounds for discipline.**   The board may suspend or revoke a license pursuant to Title 5, section 10004.   The following are grounds for an action to refuse to issue, modify, restrict, suspend, revoke or refuse to renew the license of an individual licensed under this chapter:
>
> **A.** The practice of fraud, deceit or misrepresentation in obtaining a license under this chapter or in connection with service rendered within the scope of the license issued;
>
> . . . .
>
> **E.** Incompetence in the practice for which the licensee is licensed.   A licensee is considered incompetent in the practice if the licensee has:
>
>> **(1)** Engaged in conduct that evidences a lack of ability or fitness to discharge the duty owed by the licensee to a client or patient or the general public; or
>>
>> **(2)** Engaged in conduct that evidences a lack of knowledge or inability to apply principles or skills to carry out the practice for which the licensee is licensed;
>
> . . . .
>
> **H.** A violation of this chapter or a rule adopted by the board;
>
> . . . .
>
> **P.** Noncompliance with an order or consent agreement of the board;
>
> **Q.** Failure to produce upon request of the board any documents in the licensee's possession or under the licensee's control concerning a pending complaint or proceeding or any matter under investigation by the board, unless otherwise prohibited by state or federal law;
>
> **R.** Failure to timely respond to a complaint notification sent by the board;
>
> . . . .

32 M.R.S. § 3282-A(2)(A), (E), (H), (P), (Q), (R).

expert more than the established maximum rate for his services.  For another, the Board Chair, Defendant Gleaton, appeared to be "either sleeping or feigning sleeping, laughing, grinning, making exaggerated looks of astonishment, or headshaking during cross examinations conducted by Dr. Nass's counsel."  Compl. ¶ 104.  Dr. Gleaton also made an out-of-turn comment while Nass's counsel was examining the Board's expert and did not initially acknowledge the comment when the hearing officer mistakenly reprimanded Nass for the disruption.

As of the filing of her Complaint, on August 16, 2023, Nass had been suspended from practicing medicine "without a hearing conclusion" for over nineteen months. Compl. ¶ 80.  The Board eventually issued its decision and order on December 12, 2023. Defs.' Procedural Update (ECF No. 20-1).  In its decision and order, the Board unanimously found multiple violations of standards of practice and also concluded that certain alleged violations did not occur.  Defs.' Procedural Update at 13–16.  The Board "renewed [Nass's] pending renewal application," but imposed a license suspension and a period of probation.  Defs.' Procedural Update at 16–17; *see also* Dec. 14, 2023 Mot. for Withdrawal and Modification of Decision and Order at 4 (ECF No. 20-2).  On or about December 28, 2023, Nass filed a petition for judicial review of the Board's decision and order, which petition arises under Maine Rule of Civil Procedure 80C and is pending in the Maine Superior Court.  Pet. for Review (ECF No. 20-3).  The gravamen of Nass's petition is that the Board's investigation and suspension of her license are the result of disqualifying bias and a retaliatory mindset related to her public criticism of the government's response to the COVID-19 pandemic.  In subparagraphs contained within her sole count for review

of agency action, Nass contends that the board proceedings violated her state and federal due process rights as well as her rights under the First Amendment.  Pet. for Review ¶¶ 66–67.[8]

In this civil action, Nass seeks declaratory and injunctive relief, compensatory and punitive damages, and attorney's fees and costs.  Nass's overarching arguments are that the Defendants' conduct has chilled her free speech and that the disciplinary proceedings constitute retaliation against her for expressing views that the Board disfavors.  Nass contends that the potential grounds for disciplinary action in the Second Amended Notice of Hearing "are frivolous and serve as a mere pretext" to punish her for her speech.  Compl. ¶ 81.  According to Nass, her nineteen-month interim suspension, which the Board maintained "despite the modest nature of the remaining grounds" for possible discipline, evinces the Board's retaliatory animus.  Compl. ¶ 92.  Nass further assigns retaliatory bias to the Board's decision to bring disciplinary charges against her without interviewing her patients, Defendant Gleaton's silence when Nass was accused of disrupting the disciplinary hearing, the Board's violations of its expert witness policy, and the Board's request that Nass answer questions that "were designed to elicit information to undermine [her] public statements [and] provide leads for potential sources of other complaints against [her]."  Compl. ¶ 69.

The Complaint includes six counts.  In Count 1, a § 1983 claim brought against the Board only, Nass alleges that 32 M.R.S. § 3282-A, as construed by the Position Statement

---

[8] Oral argument occurred before then-Chief Judge Jon D. Levy on January 17, 2024.  Tr. of Hr'g (ECF No. 22).  On May 6, 2024, the case was reassigned.

and as applied to her, violates the First Amendment to the United States Constitution.  In Count 2, a § 1983 claim brought against the Board only, Nass alleges that 32 M.R.S. § 3282-A, as construed by the Position Statement and as applied to her, is unconstitutionally vague.  In Count 3, another § 1983 claim, Nass alleges that the Board and the Individual Defendants, acting in their official capacities, retaliated against her for exercising her First Amendment rights.  In Count 4, brought against the Board only, Nass alleges that 32 M.R.S. § 3282-A, as construed by the Position Statement and as applied to her, violates free speech and due process guarantees under the Maine Constitution, Me. Const. art. I, §§ 4, 6-A.  In Count 5, brought against all the Board and the Individual Defendants acting in their official capacities, Nass alleges a violation of the Maine Civil Rights Act, 5 M.R.S. §§ 4681-85.  And in Count 6, Nass seeks a recovery against the Individual Defendants in their personal capacities.[9]

## DISCUSSION

The Defendants move to dismiss under Rules 12(b)(1), for lack of subject-matter jurisdiction,[10] and 12(b)(6), for failure to state a claim.  Fed. R. Civ. P. 12(b)(1), (6).  The primary thrust of their Motion is a request that the Court "apply *Younger* abstention," but

---

[9] Count 6 is stated under a "punitive damages" heading.  Technically, punitive damages is a form of relief and not a legal cause of action.  *South Port Marine*, *LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 64 (1st Cir. 2000).  I construe Count 6 as a claim that the individual defendants are personally liable for deprivations of Nass's federal and state constitutional rights, as that is the obvious assertion she makes beneath the heading.

[10] Rule 12(b)(1) "overspread[s] a variety of different types of challenges to subject-matter jurisdiction" including "those grounded in considerations of . . . sovereign immunity."  *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 362–63 (1st Cir. 2001).  The Defendants' Motion to Dismiss is premised in part on the argument that sovereign immunity bars Nass's claims against the Board and the individual defendants in their official capacities.  *See* Mot. at 12–14.

the Defendants also contend that the dismissal of any surfeit claims is appropriate on the merits based on the application of federal and state immunity doctrines. Mot. at 1–2.

## A.    *YOUNGER* ABSTENTION

The Defendants raise a threshold issue implicating the Court's jurisdiction: whether the Court should abstain from deciding this case under *Younger v. Harris*, 401 U.S. 37 (1971). The *Younger* doctrine enshrines "equitable principles of comity and federalism" and imposes a prudential limitation on the exercise of federal court jurisdiction to avoid undue intervention by federal judges into a limited collection of state judicial and quasi-judicial proceedings. *Ohio Bur. of Empl. Servs. v. Hodory*, 431 U.S. 471, 479 (1977). In such matters, it is generally deemed appropriate "to allow the State an opportunity to set its own house in order" as to federal questions rather than having a federal court ride herd over the state proceedings and the officer(s) who conduct them. *Id.* at 479–80 (internal quotation marks omitted).

The kinds of matters subject to the *Younger* abstension doctrine include ongoing state civil proceedings "akin" to prosecutions. *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975). Such civil proceedings have been described as "civil enforcement proceedings" and "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 73 (2013) (internal quotation marks omitted). The hallmarks of such proceedings are that they are "initiated to sanction the federal plaintiff . . . for some wrongful act," *id.* at 79; "a state actor is routinely a party to the state proceeding and often initiates the action," *id.*, and "[i]nvestigations are commonly involved, often culminating in the filing of a

formal complaint or charges," *id.* at 79–80. *See Sirva Relocation*, *LLC v. Richie*, 794 F.3d 185, 193 (1st Cir. 2015) (outlining the "*Younger* taxonomy").

For present purposes, state "disciplinary proceedings against state-licensed professionals" ordinarily fall within the ambit of what is meant by civil enforcement proceedings within the *Younger* taxonomy. *Philip Morris Inc. v. Harshbarger*, 946 F. Supp. 1067, 1076 (D. Mass. 1996) (first citing *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982) (lawyers); and then citing *Bettencourt v. Bd. of Registration in Medicine*, 904 F.2d 772, 778 (1st Cir. 1990) (physicians)).[11]  However, disciplinary proceedings that fall within the *Younger* taxonomy may fall out of it if they do not satisfy three additional requirements, often labeled the "*Middlesex* factors."  *Sirva Relocation*, 794 F.3d at 192, 196 (citing *Middlesex*).  And even if these are all satisfied, it is still possible that an exception might make the case a poor candidate for *Younger* abstention.  *Id.* at 193.

Nass only disputes the third *Middlesex* factor, which requires that the state proceedings afford a meaningful opportunity to raise defenses based on the federal rights raised in the district court.  *Id.*  If all the *Middlesex* factors check out, it is still possible that evidence of bias by the state tribunal is so great that abstention would be contrary to the district court's "virtually unflagging obligation" to exercise jurisdiction over controversies involving federal questions.  *Id.* at 191 (quoting *Colorado River Conserv. Dist. v. United*

---

[11] Nass does not dispute that the state proceedings here fall within the *Younger* taxonomy.  *See* Resp. to Mot. at 3 (ECF No. 16).

*States*, 424 U.S. 800, 817 (1976)); *see Brooks v. N.H. Sup. Ct.*, 80 F.3d 633, 639–40 (1st Cir. 1996) (discussing bias exception to *Younger* abstention).

Nass contends that she cannot raise her federal constitutional claims in appealing the Board's disciplinary sanction against her.  Nass also attempts to mount a case for the bias exception to *Younger* abstention.  Because I am satisfied that all of the other requirements for abstention are met here, the remainder of the *Younger* discussion focuses on the two challenges articulated by Nass.

### 1.  The Only Contested *Middlesex* Factor Is Satisfied

Nass contends that "[t]he Board proceedings do not provide an adequate opportunity . . . to raise her constitutional challenges" because they "adjudicate[] different issues" and "involve[] different parties, different relief, and different factfinders"[12] and also because her "opportunity for meaningful consideration of the facts" in that forum "is sharply limited by the Maine [Administrative Procedure Act]."  Resp. to Mot. at 4–5.

"Except in the most extraordinary cases, a federal court must presume that state courts . . . are fully competent to adjudicate federal constitutional and statutory claims properly presented by the parties."  *Casa Marie, Inc. v. Super. Ct. of P.R.*, 988 F.2d 252, 262 (1st Cir. 1993) (footnote omitted); *accord Middlesex*, 457 U.S. at 431 ("Minimal respect for the state processes, of course, precludes any *presumption* that the state courts will not safeguard federal constitutional rights.").  Thus, "the third *Middlesex* factor is

---

[12] Nass "is seeking relief for the Board's pre-hearing investigatory conduct intended to retaliate against her, and to bring a pre-enforcement challenge to the position statement announced by the Board."  Resp. to Mot. at 7.  She contends that the Board lacks jurisdiction "to award [her] damages, injunctive relief, or a declaration that the position statement is unlawful" and also that "the best she can achieve" on appeal from the Board's decision "is vacatur of any final disciplinary action."  *Id.* at 4–5.

generally deemed satisfied as long as no state procedural rule bars the assertion of federal defense and the state affords a fair opportunity to raise that defense" to the state adjudicator's decision.  *Sirva Relocation*, 794 F.3d at 196; *see also Middlesex*, 457 U.S. at 432 ("Where vital state interests are involved, a federal court should abstain 'unless state law clearly bars the interposition of the constitutional claims.'" (quoting *Moore v. Sims*, 442 U.S. 415, 426 (1979))).  "The burden is on the federal plaintiff to show that state procedural law bars presentation of [her] claims."  17B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4252 (3d ed.) (first citing *Penzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 15–16 (1987); and then citing *Moore*, 442 U.S. at 432).[13]

Here, the relevant state proceedings are the Board's disciplinary proceedings against Nass and any appeal therefrom.  *See Maymó-Meléndez v. Álvarez-Ramírez*, 364 F.3d 27, 35 (1st Cir. 2004) (observing that administrative proceedings are "ongoing" for *Younger* abstention purposes until state judicial review is completed (citing *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 374 (1989) (Rehnquist, C.J., concurring))).  The disciplinary proceedings encompass the Board's investigation into potentially sanctionable conduct, as identified by either a third-party complaint or the Board itself.  *See* 32 M.R.S. § 3282-A(1) (defining the scope of Board disciplinary

---

[13] The question is not whether a claim for specific relief will be afforded in the state proceedings, such as an award of money damages, but rather whether the state proceedings provide a meaningful opportunity to assert a "claim" that the proceedings work a deprivation of a federal right.  The Supreme Court has considered the issue in terms of "the opportunity to level constitutional challenges," *Ohio C. R. Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 629 (1986), and the First Circuit has observed that a litigant's inability to secure a damages award against the state officials responsible for the civil enforcement proceedings from the state court review of a state agency adjudication is not an impediment to *Younger* abstention.  *Rossi v. Gemma*, 489 F.3d 26, 37 (1st Cir. 2007); *see also Sirva Relocation*, 794 F.3d at 196 ("The last *Middlesex* factor deals with the adequacy of the opportunity to raise federal defenses in the state proceeding.").

proceedings).  Any subsequent appeal includes both Nass's merits challenge to the Board's final disciplinary decision, M.R. Civ. P. 80C(a), and any claims "joined . . . alleging an independent basis for relief from governmental action," M.R. Civ. P. 80C(i), such as the failure to respect Nass's federal speech rights.

In Maine, a state court considering a petition from final agency action joined with independent claims for relief acts in two distinct capacities: as an appellate court when reviewing the governmental action and as a trial court when weighing the independent claims. *Baker's Table*, *Inc. v. City of Portland*, 743 A.2d 237, 242 (Me. 2000) (explaining state procedure associated with the analogous Maine Rule of Civi Procedure 80B).[14]  As to the review of the underlying agency action, the state court may "[r]everse or modify the decision" upon concluding that "the administrative findings, inferences, conclusions or decisions . . . violat[e] constitutional or statutory provisions." 5 M.R.S. § 11007(4)(C)(1). As to the independent claims, the reviewing court does not act from a preexisting administrative record but instead from a separate record developed through discovery "allowed as in other civil actions." M.R. Civ. P. 80C(j).  *Cf. Baker's Table*, 743 A.2d at 240–41 (acknowledging that "[t]he presentation of facts to the court" on independent claims joined with a Rule 80B petition "will ordinarily be controlled by Rule 16" of the Maine Rules of Civil Procedure).

---

[14] Although *Baker's Table* considered a petition brought under Rule 80B, which governs review of governmental action, that rule's subsection on "Joinder with Independent Action" is substantially similar to its identically titled analogue in Rule 80C.  *Compare* M.R. Civ. P. 80B(i), *with* M.R. Civ. P. 80C(i).  *See* M.R. Civ. P. 80C 1983 advisory committee's note to new rule 80C ("Rule 80C(i) is similar to the contemporaneous amendment adding Rule 80B(i).").

The Complaint plainly establishes that Nass already raised an argument before the Board implicating her First Amendment rights when, after the First Amended Notice of Hearing issued, she moved to dismiss the proceedings for attempting to discipline her for allegedly protected speech. *See* Compl. ¶ 78. That fact supports the inference that Nass had an opportunity to raise federal challenges to the Board proceedings, including to the Board's "pre-hearing" and "pre-enforcement" conduct. Resp. to Mot. at 7. In any event, Nass does not identify any limitation in Rule 80C that prevents her from raising her claim that the Board proceedings were in derogation of her federal rights. Absent that showing, and because "it is sufficient under *Middlesex* . . . that constitutional claims may be raised in state-court judicial review of the administrative proceeding," Nass's contention that the state proceedings are inadequate must fail. *Ohio C.R. Comm'n.*, 477 U.S. at 629 (citation omitted); *accord Moore*, 442 U.S. at 430 ("[T]he only pertinent inquiry is whether the state proceedings afford an adequate opportunity to raise the constitutional claims . . . ."). The same benchmark for adequacy—whether a party has an opportunity to *raise* claims in the state proceedings—also renders irrelevant Nass's argument that the state proceedings are lacking because they involve different parties, remedies,[15] and factfinders than this federal case.

---

[15] For reasons outlined above, it is not essential to *Younger* abstention that the state court review process afford independent claims for damage remedies against the state officers who conducted the underlying disciplinary proceedings. Under Maine Supreme Judicial Court precedent, the damages and injunctive relief that Nass seeks are available through the ongoing state proceedings, albeit not necessarily by joining personal liability claims against the state officers who directed the Board's actions, as opposed to the Board itself. *See Fleming v. Comm'r Dep't of Corr.*, 795 A.2d 692, 695 (Me. 2002) (holding that a "request for injunctive relief is not inconsistent with 5 M.R.S.A. § 11007(4)(B), which gives the court, in an action pursuant to Rule 80C . . . the power to 'direct the agency to . . . take such action as the court deems necessary.'" (quoting 5 M.R.S. § 11007(4)(B))); *id.* ("Rule 80C anticipates that a plaintiff (or petitioner) may add an independent claim for damages, and the rule provides a procedure for handling that independent claim."); *see also Maine Merchants Assoc., Inc. v. Campbell*, 287 A.2d 430 (Me. 1972) (reviewing a petition

In sum, Nass has not shown that the ongoing state proceedings fail to provide her an adequate opportunity to raise her federal claims.  Accordingly, the only contested *Middlesex* factor is satisfied, and I must abstain from exercising jurisdiction under *Younger* unless, as Nass contends, a doctrinal exception applies.

## 2.  The Bias Exception to *Younger* Abstention is Inapplicable

Nass argues that I should not abstain from exercising jurisdiction under *Younger* because she has "plausibly allege[d] that the Board suffers from institutional bias against [her]."  Resp. to Mot. at 7.  In support, Nass cites facts asserted about the Board's conduct preceding the disciplinary hearing, namely: (1) ordering her to undergo a neuropsychological evaluation without having received an allegation about her mental state, physical condition, or substance misuse to justify that directive; (2) issuing unnecessary subpoenas and inquiries into the basis for her public statements; and (3) implementing an immediate order of suspension.  Nass also points to allegations that the Board violated its own policy when hiring an expert to testify against her and that the Board's Chair, Defendant Gleaton, serves as a director of FSMB, the private organization whose view the Board endorsed in the Position Statement, as examples of bias in the state proceedings that support exercising jurisdiction here.

For *Younger* purposes, "[t]he bias standard encompasses 'cases in which extreme bias completely renders a state adjudicator incompetent and inflicts irreparable harm upon

---

from final agency action joined with an independent claim seeking declaratory relief); *Miller v. Maine Dep't of Corr.*, No. CIV.A. AP-03-016, 2004 WL 3196888, *3 (Me. Super. Ct. Nov. 17, 2004) (reviewing a Rule 80C petition joined with an independent declaratory judgment claim); *see also* 5 M.R.S. § 11007(4)(C)(1) (permitting a court reviewing a final agency action to reverse decisions made "in violation of constitutional . . . provisions").

the petitioner.'"  *Christian Action Network v. Maine*, 679 F. Supp. 2d 140, 148 (D. Me. 2010) (quoting *Esso Standard Oil Co. v. López-Freytes*, 522 F.3d 136, 143 (1st Cir. 2008)). Where the state adjudicator is infected with disqualifying bias, the availability of judicial review in state court is insufficient to support *Younger* abstention.  *Esso Standard Oil v. Cotto*, 389 F.3d 212, 221 (1st Cir. 2004).  "Without a showing to the contrary, state administrators 'are assumed to be [people] of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.'"  *Withrow v. Larkin*, 421 U.S. 35, 55 (1975) (quoting *United States v. Morgan*, 313 U.S. 409, 421 (1941)).  Their presumed "impartiality cannot be trumped by free-floating invective, unanchored to specific facts."  *Brooks*, 80 F.3d at 640.  Instead, "the baseline showing of bias necessary to trigger *Younger*'s escape mechanism requires the plaintiff to offer some evidence that abstention will jeopardize [her] due process right to an impartial adjudication."  *Id.*  Further to the point, claims of general institutional bias alone do not trigger the exception; they require "a further showing, such as a potential conflict of interest or a pecuniary stake in the outcome" of the state proceedings.  *Id.* (citations omitted).

Most of the facts Nass asserts to anchor her claim of general institutional bias do not come close to demonstrating the extreme bias necessary to overcome the presumption of impartiality that the Defendants enjoy.  *Cf. Brooks*, 80 F.3d at 640 ("[A]n entire group of adjudicators cannot be disqualified wholesale solely on the basis of an alleged institutional bias in favor of a rule or policy promulgated by that group.").  Conduct arguably inconsistent with the Board's statutory authority and policies, like directing a neuropsychological evaluation and paying a premium to hire an expert from away,

17

broaches bias without rebutting the Board's presumed impartiality.  In other words, even if such conduct may suffice to state an independent claim, it does not warrant a departure from the equitable principles of comity and federalism that underlie *Younger* abstention.

As for Nass's contention that Defendant Gleaton's dual roles as Board chair and as the FSMB director creates a conflict of interest that undermines Gleaton and the Board's presumed impartiality, it also misses the mark.  Nass pleads that Gleaton's roles violate Maine's conflict-of-interest policy for appointees to professional licensing boards, *see* Compl. ¶ 102; Compl. Ex. 10 (ECF No. 1-10),[16] and that she twice sought to disqualify Gleaton on that basis,[17] Compl.  ¶ 103.  However, Maine's conflict-of-interest policy bars members of licensing boards, like Gleaton, from holding leadership positions in "[p]rofessional or trade associations [that] serve the best interests of the profession," Compl. ¶ 102, not associations established to advance a public health agenda.

The Complaint alleges that the FSMB is a "private advocacy organization" without pleading that the group promotes the interests of the medical profession exclusively or even primarily.  Compl. ¶ 100.  Nass asserts only that the FSMB "advocates for federal and state policies which, in the FSMB's opinion, positively impact the health and safety of patients and the medical regulatory system," Compl. ¶ 26, and also that the organization has an agenda that is both "private" and "political," Compl. ¶¶ 25, 103.  Contrary to Nass's contentions, those allegations do not establish that Gleaton's dual roles served competing

---

[16] The policy provided on the record dates to 2017.  The parties do not dispute its continued application during the pendency of Board proceedings against Nass.

[17] This assertion is a prerequisite to invoking the bias exception to *Younger*.  *Brooks*, 80 F.3d at 640 ("[T]he bias exception to the *Younger* abstention doctrine is inapposite if an ostensibly aggrieved party fails to employ available procedures for recusal of allegedly biased [adjudicators].").

interests and created a conflict that would justify finding the extreme bias necessary to sidestep *Younger*. Instead, I take the FSMB at face value: as an association of state licensing entities organized to serve the public interest by regulating medical professionals within their respective jurisdictions, not as a self-interested group of medical professionals to which the public interest is, at best, a secondary concern. With that, Nass's attempt to overcome *Younger* abstention based on extreme bias falls flat.

### 3. *Younger* Summary

Because the ongoing state proceedings provide Nass an adequate opportunity to raise her federal claims, which satisfies the only contested *Middlesex* factor, and absent evidence of bias implicating a due process concern, I am persuaded that *Younger* abstention is appropriate and abstain from exercising jurisdiction over Nass's effort to quell the state proceedings.

A court that abstains from exercising jurisdiction under *Younger* ordinarily dismisses the federal action. *Bettencourt*, 904 F.2d at 781. However, to the extent that the federal action includes a damages claim, a court "ordinarily may only stay the action, rather than dismiss the action in its entirety." *Rossi v. Gemma*, 489 F.3d 26, 38 (1st Cir. 2007). Here, because Nass asserts claims for damages against the Individual Defendants, a partial stay rather than outright dismissal is apt. In effect, Nass's core effort to upend the state enforcement proceedings through an award of injunctive or declaratory relief against the Board or the Individual Defendants in their official capacities is dismissed without

prejudice based on *Younger*,[18] but her claims for damages against the Individual Defendants in their personal capacities will be stayed for later consideration upon the conclusion of the state proceedings.

Nevertheless, the Individual Defendants observe that, to the extent there are claims that ordinarily would be subject to a stay, a district court may separately evaluate whether those claims succumb to another argument for dismissal. Resp. to Mot. at 1–2; *see also Bettencourt*, 904 F.2d at 781. If so, there is no point in ordering an indefinite stay and the court will act appropriately by reaching the alternative arguments for dismissal. Because the Individual Defendants raise other grounds for dismissal of the damages claims against them—to wit, their entitlement to qualified and absolute immunity—I proceed to consider those affirmative defenses.

## B.   INDIVIDUAL DEFENDANTS' IMMUNITY

What remains in the wake of *Younger* abstention and sovereign immunity are Nass's claims against the Individual Defendants in their individual capacities seeking damages. The Individual Defendants argue qualified immunity and absolute immunity insulate them from those claims.

---

[18] Nass's claims against the Board and her official capacity claims against the Individual Defendants also run headlong into the Eleventh Amendment to the United States Constitution. "'Long interpreted as an affirmation of state sovereign immunity, . . . the amendment . . . bars a citizen from bringing a federal court action against his or her own State,' including instrumentalities of the state, such as state agencies." *Town of Barnstable v. O'Connor*, 786 F.3d 130, 138 (1st Cir. 2015) (alterations and citation omitted) (quoting *Maysonet-Robles v. Cabrero*, 323 F.3d 43, 48 (1st Cir. 2003)). "States and their agencies are entitled to sovereign immunity 'regardless of the relief sought.'" *Poirier v. Mass. Dep't of Corr.*, 558 F.3d 92, 97 (1st Cir. 2009) (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)). However, the *Younger* abstention doctrine takes precedence in my discussion because the case also presented official capacity claims for prospective equitable and/or injunctive relief against the Individual Defendants that would clear the bar presented by the Eleventh Amendment. *See Chaulk Servs., Inc. v. Mass. Comm'n Against Discrimination*, 70 F.3d 1361, 1371 (1st Cir. 1995).

### 1.  Qualified Immunity

"When government officials are sued in their individual capacities for money damages, the doctrine of qualified immunity shields them from pecuniary liability unless their conduct violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Lawless v. Town of Freetown*, 63 F.4th 61, 67 (1st Cir. 2023) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  Qualified immunity "protects all state actors except 'the plainly incompetent and those who knowingly violate the law.'"  *Haley v. City of Bos.*, 657 F.3d 39, 47 (1st Cir. 2011) (alteration omitted) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  Despite its broad sweep, the doctrine "does not 'shield public officials who, from an objective standpoint, should have known that their conduct was unlawful.'"  *Id.* (quoting *Pagán v. Calderón*, 448 F.3d 16, 31 (1st Cir. 2006)).  The Supreme Court has "repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation."  *Pearson*, 555 U.S. at 232 (2009) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)); *cf. Costa-Urena v. Segarra*, 590 F.3d 18, 28–29 (1st Cir. 2009) ("The qualified immunity doctrine provides defendant public officials an *immunity from suit* and not a mere defense to liability." (emphasis added) (quoting *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009))).

The qualified immunity inquiry follows a two-part test: (1) whether the facts alleged by the plaintiff make out a violation of a constitutional or other federal right, and (2) whether the right was clearly established at the time of the defendant's alleged misconduct.  *Pearson*, 555 U.S. at 232.  Courts "may address either prong of the qualified

immunity analysis first," and "[a]n official may be entitled to qualified immunity 'based on either prong.'" *Ablordeppey v. Walsh*, 85 F.4th 27, 32–33 (1st Cir. 2023) (quoting *Est. of Rahim by Rahim v. Doe*, 51 F.th 402, 410 (1st Cir. 2022)).

Nass contends that the Individual Defendants violated her clearly established rights by initiating and conducting disciplinary proceedings against her for "engaging in public speech about and reporting on the COVID-19 vaccine, the COVID-19 pandemic and its treatment, the governmental response to the pandemic, and related topics," Compl. ¶ 127, and for disseminating COVID-19 misinformation.

For purposes of the Rule 12(b)(6) portion of the pending Motion, without prejudice to the Individual Defendants' ability to re-raise the question, I decline to summarily dismiss the case based on qualified immunity. It has long been clearly established that the government cannot coerce speech through punitive threats or measures, except in narrowly limited circumstances. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 570 (1942); *Berge v. Sch. Comm. of Gloucester*, No. 22-1954, 2024 WL 3408206 (1st Cir. July 15, 2024). Ultimately, that general principle may or may not be dispositive of the Individual Defendants' bid for qualified immunity, but it is suffient for me to choose a stay over dismissal in the context of a case that is otherwise subject to abstention.

## 2. Quasi-Judicial and/or Prosecutorial, Absolute Immunity

"Absolute immunity applies to a narrow swath of public officials, including judges performing judicial acts within their jurisdiction, prosecutors performing acts intimately associated with the judicial phase of the criminal process, and agency officials with

functions similar to judges and/or prosecutors." *Goldstein v. Galvin*, 719 F.3d 16, 24 (1st Cir. 2013) (internal quotation marks omitted). "The protection afforded by an absolute immunity endures even if the official acted maliciously and corruptly in exercising his judicial or prosecutorial functions." *Id.* (internal quotation marks omitted). "Although this concept of absolute immunity allows some abuses of official power to go unredressed, it is necessary for the effective administration of government that government workers be able to perform their jobs without fear of liability." *Ricci v. Key Bancshares of Me.*, *Inc.*, 768 F.2d 456, 462 (1st Cir. 1985). "The proponent of a claim to absolute immunity bears the burden of establishing the justification for such immunity." *Antoine v. Byers & Anderson*, *Inc.*, 508 U.S. 429, 432 (1993).

Insofar as the Individual Defendants rely on quasi-judicial immunity, I initially pass over the contention given that Nass's Complaint clearly implicates something more than the exercise of the judicial role; it also implicates the legitimacy of the institution of the enforcement proceedings and certain pre-hearing sanctions against her. Thus, the proper place to begin is with this question: Whether the institution of the proceedings and the imposition of a prehearing suspension and mental evaluation were within the parameters of absolute prosecutorial immunity? *See Goldstein*, 719 F.3d at 26.

"The baseline rule is that a state official who performs prosecutorial functions, including the initiation of administrative proceedings that may result in legal sanctions, is absolutely immune from damages actions." *Id.* Ancillary investigative work comes within this broad grant of immunity. *Id.* at 26–27; *see also Imbler v. Pachtman*, 424 U.S. 409, 431 n.33 (1976) ("[T]he duties of the prosecutor in his role as advocate for the State involve

actions preliminary to the initiation of a prosecution and actions apart from the courtroom.").  And "an accusation of a conflict of interest does not trump a claim of absolute immunity." *Goldstein*, 719 F.3d at 28 (quoting *Guttman v. Khalsa*, 446 F.3d 1027, 1033–34 (10th Cir. 2006)).

*Goldstein* and the cases it relies on demonstrate that, ordinarily, the Individual Defendants would be absolutely immune from Nass's damages claims to the extent the claims are based on the institution of the enforcement proceeding.  However, it remains to be seen whether absolute immunity recedes as to other acts the Individual Defendants performed, like imposing the extended "temporary" suspension and requiring Nass to undergo a mental health examination, or perhaps their conduct of an insufficiently adversarial adjudicatory process.  For instance, absolute immunity does not shield a prosecutor who performs the role of a "complaining witness in support of a warrant application." *Van de Kamp v. Goldstein*, 555 U.S. 335, 343 (2009) (citing *Kalina v. Fletcher*, 522 U.S. 118, 132 (1997) (Scalia, J., concurring)).  In that context, at least, a prosecutor enjoys only qualified immunity, not absolute immunity.  *Buckley v. Fitzsimmons*, 509 U.S. 259, 274 (1993).

Without presuming to resolve the matter at this juncture, as I did with the preceding discussion of qualified immunity, I find it sufficient for purposes of deciding whether to dismiss or stay the damages claims that imposing a mental health examination may be adequately protected by the doctrine of qualified rather than absolute immunity.  Given the

allegedly retaliatory nature of that act, the absolute versus qualified immunity contention deserves more thorough consideration.

Returning to the adjudicative function, in principle, "the safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct." *Butz v. Economou*, 438 U.S. 478, 512 (1978). "The insulation of the judge from political influence, the importance of precedent in resolving controversies, the adversary nature of the process, and the correctability of error on appeal are just a few of the many checks on malicious action by judges." *Id.* "Because these features of the judicial process tend to enhance the reliability of information and the impartiality of the decisionmaking process, there is a less pressing need for individual suits to correct constitutional error." *Id.*

Such safeguards justify the application of absolute over qualified immunity, but do they obtain here?  Absolute judicial immunity will extend to officials engaged in administrative agency enforcement proceedings if those proceedings share "enough of the characteristics of the judicial process." *Id.* at 513.  Based on a preliminary review of the allegations and the sparse record provided by the Individual Defendants, who bear the burden of satisfying the *Butz* requirements, this may be a case in which it is appropriate to deny absolute immunity, but only if the Board's administration of the enforcement proceedings did not afford meaningful political safeguards and/or adversarial procedures. These considerations can await the resolution of the state proceedings.   Indeed, commenting on them now would effectively commandeer the state court's review of Nass's

due process concerns and, in turn, undermine the comity that *Younger* abstention is meant to preserve.

## CONCLUSION

For the reasons outlined above, Defendants' Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**.  (ECF No. 14.)  Specifically, Plaintiff's claims against the Board of Licensure in Medicine and the Individual Defendants acting in their official capacities are **DISMISSED WITHOUT PREJUDICE**.  This disposition affects Counts 1, 2, and 4, which are subject to the dismissal order.  It also affects Counts 3, 5, and 6, but is not wholly dispositive of those Counts to the extent they can be read to assert or support personal capacity claims against the Individual Defendants for compensatory and punitive damages.  As for the personal capacity claims, further proceedings are **STAYED** pending resolution of the state proceedings.

SO ORDERED.

Dated this 24th day of July, 2024.

/s/ Lance E. Walker
Chief U.S. District Judge