UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| MERYL J. NASS, M.D. | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-00321-LEW |
| | ) | |
| MAINE BOARD OF LICENSURE IN MEDICINE, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |

**ORDER ON DEFENDANTS' RENEWED MOTION TO DISMISS**
**AND LIFTING STAY**

This matter returns following the conclusion of proceedings in state court arising under Rule 80C of the Maine Rules of Civil Procedure. I previously dismissed without prejudice Counts 1, 2, and 4 of Plaintiff Meryl J. Nass's Complaint (the Board-defendant and official capacity claims) and stayed Counts 3, 5, and 6 (personal capacity claims) pending the outcome of the Rule 80C proceedings. I did so "[b]ecause *Younger* abstention restrain[ed] me from exercising jurisdiction . . . while the Board's disciplinary proceedings remain ongoing," inclusive of Plaintiff's Rule 80C petition for judicial review by the Maine Superior Court and any further appeal, if taken. *See* Order on Defs. Mot. to Dismiss at 1-2, 19-20 & n.18 (ECF No. 26) (referencing *Younger v. Harris*, 401 U.S. 37 (1971)). As a consequence of the prior ruling, the active claims in this matter are limited to the personal capacity claims, which I interpreted as being located in Plaintiff's Complaint at Count 3 (42 U.S.C. § 1983 – First Amendment Retaliation), Count 5 (Maine Civil Rights Act, 5

M.R.S. § 4681 – free speech retaliation), and Count 6 (labeled punitive damages and seeking to impose liability on Defendants in their "individual" capacities).[1]

This Order now formally lifts the stay. Additionally, the matter is before the Court on Defendants' Renewed Motion to Dismiss (ECF No. 38), which I now grant in part and deny in part.

## BACKGROUND

In ruling on a motion to dismiss, the Court accepts the well-pleaded factual allegations as true and construes them in the light most favorable to the complaining party. *Marasco & Nesselbush, LLP v. Collins*, 6 F.4th 150, 166 (1st Cir. 2021). The Court also considers factual findings contained in a Maine Superior Court Rule 80C Order and Decision because it is material to Defendant's Renewed Motion to Dismiss. *Medina-Padilla v. U.S. Aviation Underwriters, Inc.*, 815 F.3d 83, 85 (1st Cir. 2016) ("Where a motion to dismiss is premised on res judicata, [a court] may take into account, in addition to the well-pleaded facts in the complaint, the record in the original action.").

[1] The dismissed counts all asserted claims against the Maine Board of Licensure and the individual defendants in their official capacities. Although these counts were dismissed pursuant to *Younger*, based on a prudential jurisdictional assessment that called for abstention, these Counts also presented jurisdictional problems arising from precedent formulated to enforce the Eleventh Amendment's sovereign immunity guarantee. *See*, *e.g.*, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984); *Guillemard-Ginorio v. Contreras-Gomez*, 585 F.3d 508, 529 n.23 (1st Cir. 2009). Moreover, given the resolution of the state proceedings, it appears rather doubtful that this controversy still presents an occasion for an award of prospective declaratory or injunctive relief. *See Guillemard-Ginorio*, 585 F.3d at 530 n.24 (1st Cir. 2009) (describing the *Ex parte Young*, 209 U.S. 123 (1908), exception to sovereign immunity under the Eleventh Amendment for official capacity claims). In any event, I make no ruling in regard to Counts 1, 2, and 4 based on such concerns because the Counts were previously dismissed and are no longer before the Court.

As alleged, this case arises out of the COVID-19 pandemic and the desire of the medical establishment, in this instance the Maine Board of Licensure in Medicine, to compel medical practitioners to toe the line in all matters related to COVID medical treatments as well as messaging concerning vaccination efficacy and treatment alternatives.

Plaintiff Meryl Nass, M.D., has been a Maine-licensed doctor since 1997 with no disciplinary infractions prior to the events narrated below. Dr. Nass has testified to Congress on six occasions and, as an acknowledged expert on anthrax and the anthrax vaccine, has been quoted in major media outlets like the New York Times, the Washington Post, the L.A. Times, and the Chicago Tribune. Dr. Nass's speech frequently involved topics like the governmental handling of the pandemic, the efficacy of masking and mask mandates, the suppression of effective medications to treat COVID-19 (such as ivermectin and hydroxychloroquine), the safety and risks of the COVID-19 vaccines, and other matters related to the pandemic. She discussed these topics on the radio, in interviews, on her blog, and elsewhere on the Internet. Dr. Nass's expressed viewpoints were critical of the government, its handling of the pandemic, and the vaccines.

The Defendants, Maroulla S. Gleaton, M.D., Holly Fanjoy, M.D., Noah Nesin, M.D., Renee Fay-LeBlanc, M.D., Brad E. Waddell, M.D., Gregory Jamison, RPh, Noel Genova, PA, Lynne M. Weinstein, and Susan Dench, all served as members of the Maine Board of Licensure in Medicine during the relevant timeframe. Dr. Gleaton served as the Chair of the Board. In the fall of 2021, Dr. Gleaton issued a position statement on behalf of the Board warning of disciplinary action for licensees "who generate and spread

COVID-19 vaccine misinformation or disinformation" "or practice based on such misinformation." Compl. ¶ 17.

Dr. Nass's viewpoints conflict with those asserted in the Board's position statement and the resources the position statement identified as useful in "support[ing] the fight against Covid-19 misinformation[.]" *Id.* ¶¶ 17, 31. On or about October 6, 2021, the Board received a complaint that Dr. Nass was spreading misinformation in a video and on her website. The complainant qualified, "I am not her patient. I have never been treated by Meryl Nass, nor has anyone I am associated or acquainted with." *Id.* ¶ 33. The next day, the Board issued a notice of complaint to Dr. Nass via email and demanded her response by November 6, 2021. On October 10, 2021, Dr. Nass questioned the Board's authority to investigate a complaint that has nothing to do with the practice of medicine and focused entirely on a statement made in her private life. The Board responded on October 14, 2021:

> The basis of the Board's jurisdiction is that there is alleged unprofessional conduct, particularly where you have communicated in your capacity as a physician in the interview and on the website that could allow patient and the public to view the information you provide as misleading and/or inaccurate.

Dr. Nass timely responded with a Nebraska Attorney General Opinion Statement that physicians cannot be disciplined for prescribing ivermectin or hydroxychloroquine off-label for treatment of COVID-19. In November 2021, Dr. Nass was invited to speak to the New Hampshire Legislature on pandemic management issues. Dr. Nass provided a copy of her testimony to the Board with a request to identify any "misinformation." The Board never responded to her request.

On November 4, 2021, Dr. Nass appeared before the Maine Board of Pharmacy and advocated for reconsideration of Maine Board of Pharmacy Statement #CI-2021 on dispensing ivermectin. Statement #01-2021 indicated that ivermectin is not FDA-approved for treatment of COVID-19, that use of ivermectin creates a rise in poison control calls, and that pharmacists should take appropriate steps to verify that ivermectin prescriptions are issued for "legitimate medical purposes." As alleged, the rise in poison control calls was actually a misleading media narrative spread by the FDA to frighten people so that they would not use a very safe anti-viral medication. Dr. Nass disputed what she believed to be a false narrative. On December 14, 2021, Dr. Nass and other physicians appeared before a group of Maine Legislators via Zoom in a meeting organized by a legislator to discuss COVID-19.

On January 11, 2022, the Board met in executive session to discuss Dr. Nass. Dr. Fay-Leblanc presented the case against Dr. Nass, observing that the complaints under consideration "really focus around unprofessional conduct due to the spreading of misinformation about COVID-19 – primarily on social media." *Id.* ¶ 49. Several of Dr. Nass's public remarks were in fact itemized in the Board's January 24, 2022, First Notice of Hearing directed to Dr. Nass. Member Dr. Waddell expressed being bothered by Dr. Nass's "harmful opinions." *Id.* ¶ 52. Based on these concerns (and others) the Board promptly ordered (among other things[2]) that Dr. Nass submit to a psychological evaluation under 32 M.R.S. § 3286 (hereafter, the "Psychological Evaluation Order"). That statute

[2] The Board also immediately suspended Dr. Nass's license to practice medicine.

authorizes the Board to require a licensee to submit to a mental or physical examination when there is a complaint or allegation that a licensee "may be unable to practice medicine with reasonable skill and safety to patients *by reason of mental illness, alcohol intemperance, excessive use of drugs, narcotics, or as a result of a mental or physical condition interfering with the competent practice of medicine*." (emphasis added). *Id.* ¶ 55. The record before the Board did not include any suggestion or information that Dr. Nass suffered from drug or alcohol abuse or a physical condition, suggesting that, if anything, the Board considered Dr. Nass's opinions to be the product of not independent thought but a mental illness or mental condition. Alternatively, the imposition of this sanction would suggest that the Board was making an example out of Dr. Nass.

The Board's order chronicled Dr. Nass's public statements (among other issues) as a cause for the Psychological Evaluation Order and immediate suspension. Further inquiries from the Board further suggest its preoccupation with Dr. Nass's public statements. The Board itemized in its charging document several charges based on Dr. Nass's speech activity and later dismissed those charges in response to a motion to dismiss them on constitutional grounds.

The remaining grounds concerned the care Dr. Nass provided to three patients, including one charge that she misrepresented facts to a pharmacist so that the patient could fill a prescription for hydroxychloroquine. These claims asserted noncompliance with the standard of care for telemedicine, but also implicitly included Dr. Nass's prescription of ivermectin and hydroxychloroquine to patients with COVID. None of the patients

complained about the care provided to them by Dr. Nass. Rather, others with connections to the patients made complaints to the Board.

The matter proceeded to an adversarial Board hearing on the patient-centered complaints and concluded with an order finding that Dr. Nass failed to meet the standard of care in relation to patient care. Dr. Nass petitioned for state court review under Rule 80C of the Maine Rules of Civil Procedure. In an order dated October 30, 2025, the Superior Court granted Dr. Nass relief on her challenge to the Board's Psychological Evaluation Order and vacated the Order, finding that the Order was arbitrary and capricious.[3] Rule 80C Order and Decision at 28 (ECF No. 35-1). The Superior Court otherwise upheld the Board's findings and sanctions, concluding, among other things, that the Board's findings of breaches of the standard for patient care and the sanctions imposed were not the product of retaliatory animus or otherwise the product of unconstitutional bias. *Id.* at 18-19 & n.11. The Superior Court determined that, ultimately, even if the Board's members "harbored personal opinions as to the substance of Dr. Nass's speech," in the context of their eventual hearing and determination, "they did not allow those opinions" to determine the outcome and instead based their determination on reliable evidence (expert testimony) that Dr. Nass's practice had fallen below the professional standard of conduct. *Id.* at 18; *see also id.* 14-16, 19. Neither party appealed the Superior Court's Rule 80C Order and Decision.

[3] Because the Superior Court vacated the order as arbitrary and capricious, it did not reach Dr. Nass's contention that the Board deprived Dr. Nass of due process. Rule 80C Order and Decision at 23 n.13.

## DISCUSSION

With their Renewed Motion to Dismiss, Defendants argue that "Maine's *res judicata* doctrine bars Dr. Nass from reasserting claims that were actually litigated or necessarily decided against her in Superior Court." Mot. at 1. Additionally, Defendants contend that "the Superior Court's 80C Decision independently establishes that individual [Board] members are entitled to both absolute and qualified immunity under the circumstances presented in the record." *Id.* "Finally," they assert, "to the extent that Dr. Nass seeks to maintain any claims grounded solely in the [Board's] vacated Order Directing Evaluation, such claims are moot because Dr. Nass suffered no cognizable legal injury from the directive, and there is no 'live' controversy since the order is no longer in effect." *Id.*

### A. *Res Judicata*

"Res judicata is a court-made collection of rules designed to ensure that the same matter will not be litigated more than once." *Cutting v. Down E. Orthopedic Assocs., P.A.*, 244 A.3d 226, 230 (Me. 2010) (quotation marks omitted). "When a matter has been litigated in state court, the claim preclusion branch of res judicata bars relitigation if: (1) the same parties or their privies are involved in both actions; (2) a valid final judgment was entered in the prior action; and (3) the matters presented for decision in the second action were or might have been litigated in the first action." *Id.* (quotation marks and internal punctuation omitted). Whether the same matters were or might have been litigated turns on a transactional test that examines "the aggregate of connected operative facts that can be handled together conveniently for purposes of trial to determine if they were founded

upon the same transaction, arose out of the same nucleus of operative facts, and sought redress for essentially the same basic wrong." *Norton v. Town of Long Island*, 883 A.2d 889, 895 (Me. 2005). For reasons that follow, I find that Defendants' *res judicata* invocation fails.

Defendants argue that because the Superior Court found that the Board's "actions were not motivated by any unconstitutional or retaliatory animus toward Dr. Nass's protected speech, she cannot prevail" on either her § 1983 damages action for First Amendment retaliation or her claim under the MCRA. Mot. at 11-12. Dr. Nass opposes this assertion. In her view, the Rule 80C litigation did not involve the same parties or their privies because it proceeded exclusively against the Board and this case proceeds against the Board's members acting in their personal capacities. Dr. Nass cites *Alston v. Town of Brookline*, 997 F.3d 23 (1st Cir. 2021), and other authority in support of the proposition that a judgment in favor of an individual acting in an official capacity does not preclude a later case against the same person in his or her personal capacity. Opp'n at 5-6. *See Alston*, 997 F.3d at 37 ("Thus, 'a person who has defended a suit brought against him in his official capacity is not protected by principles of claim preclusion from a subsequent suit brought against him by the same plaintiff[ ] in his individual capacity.'" (quoting *Goldstein v. Galvin*, 719 F.3d 16, 23 (1st Cir. 2013)); Restatement (Second) of Judgments § 36(2) ("A party appearing in an action in one capacity, individual or representative, is not thereby bound by or entitled to the benefits of the rules of res judicata in a subsequent action in which he appears in another capacity").

Defendants' rejoinder to the *Alston* supported identity-of-the-parties concern is difficult to comprehend, if they can be said to have responded to that concern at all. Essentially, Defendants argue that Dr. Nass could have pursued relief against Defendants in their personal capacities in the Rule 80C proceeding, had she elected to do so, and that she should be forever barred from doing so because she elected not to do so. This does not respond to the first *res judicata* element (identity of parties) at all, however insightful it may be concerning the third element (what matters were or might have been litigated).

Next, Defendants propose that "the Court could bypass the application of Maine *res judicata* doctrine, and instead apply . . . the Rules of Decision Act, 28 U.S.C. § 1652, [which states that] the 'laws of the several states . . . shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply.'" Reply at 5. The idea, apparently, is that the Superior Court's Rule 80C Order and Decision is now the law of the State of Maine, so "there is no controversy left to decide." *Id.* This argument, as I understand it, does not cohere with settled law, which requires federal courts to determine the preclusive force of a state court judgment according to the law of the state in which the judgment was rendered, notwithstanding the Rules of Decision Act (a federal law) to the extent it has anything different to say on the matter. *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81-85 (1984); *Shabshelowitz v. State of Rhode Island Dep't of Pub. Safety*, 155 F.4th 62, 65 (1st Cir. 2025). Also, Defendants do not cite any precedent applying the Rules of Decision Act as a super preclusion statute. I do not need to explain away this argument just because Defendants raised it. *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by

some effort at developed argumentation, are deemed waived."). The argument is also pressed for the first time in reply, which is improper. D. Me. Loc. R. 7(c); *McBreairty v. Brewer Sch. Dep't*, 783 F. Supp. 3d 394, 411 (D. Me. 2025).

**B. Absolute Immunity**

In the prior Order on Defendants' Motion to Dismiss, I declined to dismiss the personal capacity claims against Defendants based on absolute quasi-judicial or prosecutorial immunity. My analysis focused on the claim concerning prosecutorial immunity and passed over any argument for quasi-judicial immunity. My approach was to determine whether any isolated component of Dr. Nass's claim of retaliation could survive the original motion to dismiss. In particular, I flagged the Psychological Evaluation Order as potentially problematic. Order at 24.

Defendants reassert these immunity doctrines based on the Superior Court's determination that the Board "was conscious of its duty to fairly adjudicate this matter and cautious not to let biases creep into its decision-making process." Mot. at 12 (quoting Rule 80C Order and Decision at 19). They argue that the Superior Court's Order and Decision "sufficiently fills any gaps in the record needed to decide whether absolute immunity applies in this case." *Id.* at 13. Dr. Nass argues that the Superior Court Order and Decision is irrelevant to the inquiry and that the application of immunity turns on attributes of the process rather than any subjective inquiry into Defendants' "mindset." Opp'n at 10. She argues that because the Psychological Evaluation Order lacked any procedural preliminaries, it was an act to which immunity should not apply. *Id.*

"Absolute immunity applies to a narrow swath of public officials, including judges performing judicial acts within their jurisdiction, prosecutors performing acts intimately associated with the judicial phase of the criminal process, and agency officials with functions similar to judges and/or prosecutors." *Goldstein v. Galvin*, 719 F.3d 16, 24 (1st Cir. 2013) (internal quotation marks omitted). "The baseline rule is that a state official who performs prosecutorial functions, including the initiation of administrative proceedings that may result in legal sanctions, is absolutely immune from damages actions." *Id.* at 26. Moreover, "an accusation of a conflict of interest does not trump a claim of absolute immunity." *Id.* at 28 (quoting *Guttman v. Khalsa*, 446 F.3d 1027, 1033–34 (10th Cir. 2006)). But even prosecutors acting to enforce criminal laws do not enjoy absolute immunity when they assume the role of a "complaining witness in support of a warrant application." *Van de Kamp v. Goldstein*, 555 U.S. 335, 343 (2009) (citing *Kalina v. Fletcher*, 522 U.S. 118, 132 (1997) (Scalia, J., concurring)). In that context, at least, a prosecutor enjoys only qualified immunity, not absolute immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 274 (1993).[4]

"The protection afforded by an absolute immunity endures even if the official acted maliciously and corruptly in exercising his judicial or prosecutorial functions." *Id.* (internal quotation marks omitted). "Although this concept of absolute immunity allows some abuses of official power to go unredressed, it is necessary for the effective administration of government that government workers be able to perform their jobs

[4] Maine law is to like effect. *See*, *e.g.*, 14 M.R.S. § 8111(1)(B).

without fear of liability." *Ricci v. Key Bancshares of Me., Inc.*, 768 F.2d 456, 462 (1st Cir. 1985). "The proponent of a claim to absolute immunity bears the burden of establishing the justification for such immunity." *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 432 (1993).

I am persuaded by Defendants' invocation of quasi-judicial immunity with respect to the conduct of the hearing and the resulting determination. An assessment of the hearing process, which was outlined by the Superior Court and is a matter subject to judicial notice, reflects that the administrative proceedings had "enough of the characteristics of the judicial process" to support the application of absolute judicial immunity. *Butz v. Economou*, 438 U.S. 478, 512 (1978). By the time the hearing began, the charges were well-noticed and the proceedings were adversarial and orderly. And whether or not the Superior Court's assessment of the existence of bias was correct, a malicious or corrupt exercise of the quasi-judicial role would not prevent the application of absolute immunity. *Buckley*, 509 U.S. at 274. In other words, absolute immunity from a damages action based on the hearing and determination would be appropriate regardless of the Superior Court's findings and conclusions.

But I otherwise agree with Dr. Nass that the immediate imposition of the Psychological Evaluation Order did not bear any of the hallmarks of judicial proceedings. In judicial proceedings, at a minimum probable cause findings ordinarily are required to justify pretrial impositions. In this case, as alleged, the Board dispensed with preliminary proceedings altogether. Accepting for present purposes that Defendants acted in the absence of any showing that a psychological evaluation was warranted, they were

effectively acting as hybrid complainant-adjudicators misapplying their power to make *ex parte* adjudications based on a predetermined perspective that Dr. Nass must be of unfit mind to speak out as she did, largely on the basis that her views were discordant with their own orthodoxy. This assessment is reinforced by their failure to afford any process whatsoever, as alleged, which approach was alarmingly out of step with anything like the judicial process. Under these alleged circumstances, the proceedings as of January 2022 lacked any safeguards to protect against agency zeal and resembled investigatory action imposed, somewhat ironically, in the absence of evidence rather than the initiation of an impartial, sober, thoughtful judicial process designed to assess the truth of facts to arrive at the existence of probable cause to justify such a sanction.

In acting as they allegedly did, Defendants emphatically would not have been performing "*functions* essentially similar to those of judges or prosecutors, in a setting similar to that of a court." *Bettencourt v. Bd. of Registration In Med. of Com. of Mass.*, 904 F.2d 772, 782 (1st Cir. 1990). Nor is it fair to say that immunity from the potential imposition of liability for such conduct is "essential to protect the integrity" of quasi-judicial administrative proceedings. *Cleavinger v. Saxner*, 474 U.S. 193, 200 (1985). A medical licensing board has no need to conduct itself in this manner at all, the contrary is in fact probably indicated and it should always consider whether evidence of mental incompetence is extant. Other *Cleavinger* factors also militate against absolute immunity. The supposed "function" at issue (a Psychological Evaluation Order based on no evidence or process) does not need to be insulated from the "harassment" of litigation because it simply ought not occur, ever. *Id.* at 201. Nor were any "safeguards" apparent. *Id.* Nor is

it evident that the approach taken by Defendants insulated the process from undue "political influence." *Id.* To the contrary, political influence would appear to have been the point. Rather than acting as insulation against political influence, Defendants were something like conductors for it. Nor was there any apparent application of "precedent." *Id.* Nor was an adversary process employed. *Id.* That leaves only the "correctability of error on appeal." *Id.* That did occur here, but only after the Board conducted a year-long hearing during which Dr. Nass was labeled an "immediate threat to the public." *See* National Practitioner Databank Report at 2, 3 (ECF No. 41-1). That is an insufficient reed standing on its own to support the "exceptional" weight of absolute immunity. *Cleavinger*, 474 U.S. at 201. Consequently, for this component of Defendants' alleged conduct, qualified rather than absolute immunity sets the proper standard.[5]

**C. Qualified Immunity**

Defendants argue that they are entitled to qualified immunity "in light of the Superior Cour's decision." Mot. at 14. Although claim preclusion is not applicable for reasons previously outlined, issue preclusion (collateral estoppel) separately bars "the relitigation of factual issues already decided if 'the identical issue was determined by a

[5] Defendants' papers carve out the Psychological Evaluation Order as the only theoretical component of Dr. Nass's case that might deserve different treatment than every other action taken by Defendants. Dr. Nass, too, draws lines, and she would include both the Psychological Evaluation Order and the Immediate Suspension Order if absolute immunity is applied to the hearing and the ultimate decision. Because of the way the arguments have been presented, I am not persuaded that the immediate suspension order necessarily falls within the scope of quasi-judicial immunity. It would be worthwhile to consider the standard that applies to such an order and whether it depended entirely on the imposition of the Psychological Evaluation Order or was better informed from an evidentiary standpoint, pushing it into the realm of quasi-judicial conduct as opposed to political conduct. Ultimately, I intend with this Order only to insulate Defendants from liability arising out of the hearing and the eventual determination. But Defendants are free to return to the question of where the line should be drawn in later, presumably summary judgment, proceedings.

prior final judgment, and . . . the party estopped had a fair opportunity and incentive to litigate the issue in a prior proceeding.'" *Machias Sav. Bank v. Ramsdell*, 689 A.2d 595, 599 (Me. 1997) (quoting *Van Houten v. Harco Const., Inc.*, 655 A.2d 331, 333 (Me. 1995)). Defendants' argument rests on a presumption that the Superior Court's findings are preclusive on all qualified immunity elements. Yet, they also state:

> [A]lthough the [Board]'s Order Directing Evaluation did not include facts to establish the statutory grounds to accord with Maine administrative law, the Superior Court expressed no concerns that the [Psychological Evaluation] Order might have been issued out of a desire to retaliate against Dr. Nass's views on the COVID vaccine or any other motivation barred by the United States Constitution.

Mot. at 15 (emphasis added). But because the Superior Court "expressed no concerns," it is difficult to understand why issue preclusion would apply. This lack of expressed concern is hardly the same thing as a decision on the issue, and an undecided issue cannot support issue preclusion. *Doe v. Lindahl*, 293 A.3d 439, 443-44 (Me. 2023) (explaining that issue preclusion is limited to issues decided in a prior final judgment). Moreover, the Superior Court vacated the Psychological Evaluation Order after concluding it was arbitrary and capricious, which, if anything, invites further examination into the actual cause of the order. Ultimately, the Superior Court's findings and conclusions do not compel recognition of qualified immunity.

Beyond leaning on the Superior Court's findings, Defendants do not argue that the facts and circumstances alleged do not raise a controversy over a clearly established right.

Consequently, the qualified immunity discussion concludes without an examination of the actual qualified immunity standard.[6]

**D. *Heck v. Humphrey***

Defendants argue that a favorable judgment for Dr. Nass would have the effect of implying the invalidity of their administrative proceedings and, therefore, the case should be dismissed in accordance with the doctrine recognized in *Heck v. Humphrey*, 512 U.S. 477 (1994), which doctrine has been expanded outside of the criminal conviction context by "[a]t least one federal court" to lawsuits challenging administrative licensure decisions. Mot. at 17. But in the cited case, *Glunk v. Pennsylvania State Board of Medicine*, No. 1:14-cv-659, 2016 WL 8730861, at *8 (M.D. Pa. Sept. 12, 2016), *report and recommendation adopted,* 2016 WL 8710469 (M.D. Pa. Sept. 30, 2016), the district court did not apply *Heck*. It applied the favorable determination element of a malicious prosecution claim. In any event, Dr. Nass's case may proceed minimally[7] as to the Psychological Evaluation Order because success on the claim that the Order was a retaliatory sanction for disfavored speech activity does not invalidate or imply the invalidity or illegitimacy of the Board's hearing or its ultimate decision in regard to Dr. Nass's suspension for failure to meet the standard of care in relation to patient care.

---

[6] In Reply, Defendants argue that the allegations in the Complaint are insufficiently particularized as to each board member individually. Reply at 6-7. Had Defendants advanced this point in their Motion rather than in their Reply, no doubt Plaintiff would have offered a counter argument. But they did not, and so the matter can await summary judgment practice. In any event, the Complaint does notify each Defendant that they are alleged to have supported the Psychological Evaluation Order in retaliation for speech activity. Compl. ¶¶ 55-57, 67, 69, 72-73, 78-80.

[7] *See* note 5, *supra*.

### E. Mootness

Finally, Defendants argue that Dr. Nass suffered no concrete legal injury from the issuance of the Psychological Evaluation Order since she never complied. Mot. at 18-19. Dr. Nass observes, however, that her free speech claims present a live controversy because of the harm that has been caused to her by the issuance of the Order and related publicity. Drawing all available inferences in Dr. Nass's favor, the alleged harm could support a compensatory (or even nominal) damages award, either of which could set the groundwork for a punitive damages award. *Kerr-Selgas v. Am. Airlines, Inc.*, 69 F.3d 1205, 1215 (1st Cir. 1995). Consequently, the matter is not moot. *See Kuperman v. Wrenn*, 645 F.3d 69, 73 (1st Cir. 2011); *Fitzgerald v. City of Portland*, No. 2:14-cv-00053-NT, 2014 WL 5473026, at *5-6 (D. Me. Oct. 27, 2014).

## CONCLUSION

Defendants' Renewed Motion to Dismiss (ECF No. 38) is GRANTED IN PART and DENIED IN PART. Specifically, Defendants have absolute quasi-judicial immunity against those portions of Plaintiff's claims for damages arising out of the Board's hearing and its final determination. The scope of what remains of Dr. Nass's claims will need to be addressed in later proceedings but includes, at a minimum, the requirement that she submit to a psychological evaluation.

SO ORDERED.

Dated this 20th day of August, 2026.

/s/ Lance E. Walker
Chief U.S. District Judge